IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | CIVIL ACTION NO. H-07-3295 |
| v. | § | (CRIMINAL NO. H-03-217-01) |
| | § | |
| JAMIE OLIS | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court are Jamie Olis' Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Docket Entry No. 305), the United States' Answer to Motion to Vacate Pursuant to 28 U.S.C. § 2255, Motion for Summary Denial, and Supporting Memorandum of Law (Docket Entry Nos. 345-346), and Olis' Response to Government's Answer and Motion for Summary Judgment, and Motion for Reconsideration of Olis' Motion for Discovery (Docket Entry No. 349).  After careful consideration of the pending motions, the court concludes that Olis' motion to vacate, set aside, or correct sentence should be denied, the United States' motion for summary denial should be granted, and Olis' motion for reconsideration should be denied.

## I.  Procedural Background

Following his conviction for conspiracy (Count 1), securities fraud (Count 2), mail fraud (Count 3), and wire fraud (Counts 4-6), Olis was sentenced to serve 292 months in prison.  On direct appeal Olis challenged the sufficiency of the evidence and the court's application of the Federal Sentencing Guidelines.  Rejecting Olis' sufficiency of the evidence argument the Fifth Circuit explained

Olis contends, almost perfunctorily, that the evidence does not support his conviction.  In particular, he disputes the proof that he conspired to conceal two critical features of Project Alpha from Dynegy's outside auditor Arthur Andersen — the "parent level" hedge and the "tear-up" agreements.  This court will not disturb a jury's verdict unless the record demonstrates that a rational jury could not have found each of the elements of the offense beyond a reasonable doubt.  <u>United States v. Dahlstrom</u>, 180 F.3d 677, 684 (5th Cir. 1999). . .

Olis asserts that the evidence demonstrated that everyone working on Project Alpha, including Arthur Andersen accountants, knew that the bank owners of ABG Gas were fully hedged against the risk of loss from variable gas prices.  Olis's boss, Foster, testified, however, as a star prosecution witness and co-indictee, that he and Olis wrongly agreed to the tear-ups and the parent hedge and hid them from Arthur Andersen.  Jim Hecker, an audit partner at Arthur Andersen, testified that he advised Dynegy against tear-ups, and Dynegy subsequently did not reveal this aspect of Project Alpha to him.  A reasonable jury, basing its conclusion on the testimony of Foster and Hecker, together with the incriminating emails among Olis and his co-indictees and a wealth of other evidence, could easily have found Olis guilty beyond a reasonable doubt of all the charged crimes.

<u>United States v. Olis</u>, 429 F.3d 540, 542-43 (5th Cir. 2005).[1]  The

---

[1]As recognized by the Fifth Circuit, any doubt that Olis and his co-conspirators knowingly and intentionally conspired to conceal the outside hedges and tear-up agreements from Arthur Andersen and others in an effort to prevent Project Alpha from being fully disclosed was dispelled both by the testimony of co-conspirator Gene Foster and by e-mails circulated among the co-conspirators.  Foster testified that the co-conspirators actively sought to prevent documents from the Project Alpha operations manual from being distributed even to other Dynegy employees for fear that they would fall into the hands of Arthur Andersen.  See Trial Transcript (T.Tr.) Day 6, Docket Entry No. 103, pp. 209:17-213:20.  E-mail messages circulated among the co-conspirators documented the importance of keeping the Project Alpha documents to themselves.  In one such e-mail dated May 10, 2001, Olis wrote to his co-defendants, Foster and Helen Sharkey, and to another Dynegy employee who — although not indicted — was alleged to have been a co-conspirator:

(continued...)

---

[1](...continued)
Probably already know this, but huge issue to us, so I'll
nag.  It is very important that we keep structure charts
and other written info to an absolute minimum on this
deal.  Therefore, please do not forward the attached
manual in its entirety to anyone else.  Also, to extent
that cash management or some other person needs info,
should try to recreate the data necessary instead of
giving pages from document which are numbered and on Citi
headings.  Finally, the charts should never, never, never
go to anyone.

Id. at 212:4-12, and Govt. Exhibit 681.  See also id. at 211:11-
212:3, explaining when and to whom this e-mail message was sent.
Foster testified that because he agreed, he replied:  "Nagging is
fine."   Id. at 212:20-213:8 and Govt. Exhibit 681-1.   Olis,
Sharkey, and another Dynegy employee received a similar email
message from Foster concerning the importance of not distributing
the Project Alpha operations manual to others:

> It is critical that this document not be distributed.  It
> should be held only by those on this e-mail, as we are
> the only ones that have complete knowledge of this
> transaction.

Id. at 213:17-20, and Govt. Exhibit 680.  On January 31, 2002, when
Dynegy was considering the possibility of executing a second
Project Alpha-type transaction, Olis sent the following e-mail
message to Foster and to one other alleged but unindicted co-
conspirator:

> Please note that someone really needs to kill this
> transaction.  The more I think about it, there is no way
> that AA [i.e., Arthur Andersen] is going to give us an
> opinion on this one.  Also, I think by doing a second
> one, we are just jeopardizing Alpha, even if we do not
> complete . . . the idea that we tried to enter into a
> separate partnership with ICA just after their term
> interest expires really reeks and could make me cry at
> the hands of a good litigator on the witness stand.

T.Tr. Day 7, Docket Entry No. 104, p. 36:8-14, and Govt.
Exhibit 833.  See also id. at 35:21-36:5, explaining when and to
whom this e-mail message was sent.  When asked what he understood
Olis to be telling him in this e-mail message, Foster said, "By
doing another one [i.e. Project Alpha-type transaction] we were
(continued...)

Fifth Circuit concluded that "the conviction is factually supported, but Olis must be resentenced." Id. at 541. On September 12-13, 2006, a second sentencing hearing was held and on September 22, 2006, the court issued a Memorandum Opinion (Docket Entry No. 293) pursuant to which Olis was sentenced to serve 60 months in prison as to counts 1, 3, 4, 5 and 6 and 72 months in prison as to count 2 to be served concurrently for a total term of 72 months. On September 25, 2006, an Amended Judgment (Docket Entry No. 294) was entered from which Olis did not appeal.

## II.  **Standard of Review**

28 U.S.C. § 2255(a) allows

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . [to] move the court which imposed the sentence to vacate, set aside or correct the sentence.

Section 2255(b) provides that

> [i]f the court finds . . . that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

See United States v. Grammas, 376 F.3d 433, 436 (5th Cir. 2004)

("Section 2255 provides the federal prisoner with a post-conviction

---

[1](...continued)
potentially jeopardizing the first one [i.e., Project Alpha], since another one would have to be more fully disclosed." Id. at 36:18-21.

remedy to test the legality of his detention by filing a motion to vacate judgment and sentence in his trial court."). The Supreme Court has made clear that a collateral challenge "may not do service for an appeal" and that a § 2255 petitioner "must clear a significantly higher hurdle than would exist on direct appeal" in order to obtain relief. United States v. Frady, 102 S.Ct. 1584, 1593 (1982). "Nonconstitutional claims that could have been raised on direct appeal, but were not, may not be asserted in a collateral proceeding." United States v. Vaughn, 955 F.2d 367, 368 (5th Cir. 1992). Similarly, issues that were raised but rejected on direct appeal are barred from consideration on collateral review. See United States v. Webster, 392 F.3d 787, 791 (5th Cir. 2004). Thus review of convictions under § 2255 ordinarily is limited to (1) "questions of constitutional or jurisdictional magnitude, which may not be raised for the first time on collateral review without a showing of cause and prejudice," and (2) "[o]ther types of error . . . that could not have been raised on direct appeal and, if condoned, would result in a complete miscarriage of justice." United States v. Cervantes, 132 F.3d 1106, 1109 (5th Cir. 1998).

A § 2255 motion requires an evidentiary hearing unless the motion, the files, and the record conclusively show the prisoner is entitled to no relief. United States v. Bartholomew, 974 F.2d 39, 41 (5th Cir. 1992). Upon review of Olis' motion to vacate and the files and records of this case the court concludes that an evidentiary hearing is not necessary because the matters reviewed

conclusively show that Olis is not entitled to relief.  See
United States v. Drummond, 910 F.2d 284, 285 (5th Cir. 1990), cert.
denied, 111 S.Ct. 1006 (1991) (conclusive but not necessarily
direct evidence must exist for court to deny § 2255 motion without
a hearing); Rules 8(a) and 12 following § 2255 (recognizing that
hearings are not always required, and that Federal Rules of Civil
Procedure, including Rule 56, are applicable to § 2255 motions).

### III.  Undisputed Facts

In the year 2000 some analysts expressed concern that there
seemed to be a gap between Dynegy's earnings reports and its cash
flow.[2]  To address this gap, Dynegy implemented a complex, gas
trading transaction known as Project Alpha.[3]  Olis' conviction
arises from his work on Project Alpha as Dynegy's "Senior Director
of Tax Planning and International (and later, Vice-President of
Finance)." Olis, 429 F.3d at 541.  Olis' immediate supervisor was
Gene Foster, who was then Dynegy's Vice-President of Tax.[4]  The
Fifth Circuit has described Project Alpha as

> a plan to borrow $300 million and make it appear to the
> outside world (and in particular to Dynegy's auditor
> Arthur Andersen) as if the money was generated by
> Dynegy's business operations.  Project Alpha was designed

---

[2]See Direct Examination of Patrick Boultinghouse, T.Tr. Day 3,
Docket Entry No. 98, pp. 226:19-228:5.

[3]See Cross-Examination of Patrick Boultinghouse, T.Tr. Day 4,
Docket Entry No. 99, p. 127:12-25.

[4]See Direct Testimony of Gene Foster, T.Tr. Day 6, Docket
Entry No. 103, p. 90:3-4.  See also Cross-Examination of Patrick
Boultinghouse, T.Tr. Day 4, Docket Entry No. 99, p. 149:1-5.

to generate positive cash flow to Dynegy "from operations" during 2001 and negative cash flow in 2002-05. Specifically, a special purpose entity ("SPE") called ABG Gas Supply was created and owned by Deutsche Bank and Credit Suisse. During 2001, ABG Gas bought natural gas at market prices and sold it to Dynegy at a discount. Dynegy then sold the gas at market prices, netting $300 million. During 2002-05, Project Alpha arranged that ABG Gas would buy gas at market prices and resell it to Dynegy at above-market prices. That money would flow to the banks, which would recoup the $300 million, plus interest.

To support the accounting characterization of the deal as cash flow from operations, ABG Gas and the lenders could not be guaranteed full repayment on their investment. Further, ABG Gas had to be sufficiently "independent" from Dynegy, and the owners of ABG Gas had to bear risk. But contrary to these requirements, Olis, his boss Gene Foster and his colleague Helen Sharkey, secretly put into place the "parent level" hedge and the "tear-up" agreements among Dynegy, ABG's owner banks, and Citibank to ensure that the banks would not lose any money. The Government's proof indicated that Olis, Foster, and Sharkey intentionally concealed the parent level hedge and tear-ups from Jim Hecker, the Arthur Andersen partner responsible for signing off on Dynegy's SEC statements, in order to obtain the desired accounting treatment of the transaction.

On April 25, 2003, following its review of Project Alpha, the SEC required Dynegy to restate the cash flow as derived from a "financing" rather than "operations"
. . . .

Id. at 541-42.

On June 10, 2003, "Foster, Sharkey, and Olis were indicted for conspiracy to commit mail fraud, wire fraud, and securities fraud (count 1), securities fraud (count 2), mail fraud (count 3) and wire fraud (counts 4-6)." Id. at 542.[5] The indictment alleged that Project Alpha was a scheme to falsely report financing activity as operating cash flow:

---

[5]See Docket Entry No. 1.

>[T]he Defendants . . . would and did conceive, design and
>execute a plan to borrow money:  that is, to engage in a
>"financing activity" but make it appear that the borrowed
>funds were cash flow from Dynegy's "risk management
>activities" to create the false impression and illusion
>that Dynegy's cash flows from risk-management activities
>were much improved and that its earnings were of
>sufficient quality to justify, maintain and increase
>Dynegy's stock price, and to avoid the potentially
>adverse effect of a downgrade of Dynegy's credit rating.[6]

The indictment also alleged that in reporting cash flows as
operating income the defendants "did intentionally conceal from
Dynegy's auditors, the SEC, Rating Agencies, lenders, market and
securities analysts, and the investing public, the implementation
and effect of the 100% hedging strategy and the 'tear up'
language."[7]  According to the indictment, the defendants therefore

>falsely report[ed] to the SEC, Rating Agencies, lenders,
>market and securities analysts, and the investing public,
>by means of electronic filing of Quarterly Reports
>("Forms 10-Q") and an Annual Report ("Form 10-K"), that
>approximately $300,000,000 of "cash flows from financing
>activities" were "cash flows from operating activities,"
>or more specifically, "cash flows from Risk-management
>activities," throughout the last nine months of the year
>2001.[8]

The Assistant United States Attorneys (AUSA) who prosecuted Olis
were Jimmy Sledge, John Lewis, and Belinda Beek; their immediate
supervisor was Quincy Ollison; and the United States Attorney for
the Southern District of Texas was Michael Shelby.[9]

---

[6]Id. at 8 ¶ 15.

[7]Id. at 10-11 ¶ 21.

[8]Id.

[9]See Testimony of Larry Finder, Exhibit G attached to Docket
Entry No. 318, p. 137:15-17.   The page numbers used in all the
(continued...)

On June 20, 2003, Olis and his wife engaged attorney Terry Yates to defend Olis against the charges alleged in the indictment.[10]   Olis told Yates that Dynegy would pay for his representation.[11]   To ensure that Dynegy would agree to pay his fees, Yates drafted an engagement letter stating his hourly rates, Olis signed the letter, and Yates had it faxed to Cristin Cracraft, a Dynegy in-house attorney.   Cracraft phoned Yates and orally confirmed that Dynegy would pay Yates' bills, and that Yates would not charge Olis for attorneys' fees or expenses.[12]

In late June of 2003 Yates and his associate, Mark Clark, obtained boxes of relevant documents from Olis' previous attorney, Paul Coselli, and sought additional documents from Dynegy's outside counsel, Larry Finder.[13]   When in July of 2003 Yates had still not received documents from Finder, Yates wrote letters to Finder requesting relevant documents, but still did not obtain documents.[14]

---

[9](...continued)
exhibits attached to Docket Entry No. 318 are those belonging to the original document that appear at the side, as opposed to the bottom, of the pages prepared for the exhibit to the Kelly Declaration.

[10]See Yates' Testimony, Exhibit D attached to Docket Entry No. 318, pp. 18:8-9, 19:20-21, 26:1-2, 44:2, 142:20-144:8.

[11]Id. at 16:13-18, and 24:13-14.

[12]Id. at 19-21, 23:16-19, 24:13-19, 28-34, 144:2-160:18.

[13]Id. at 35-37.

[14]Id. at 40:8-42:4, 43:9-14.

On August 5, 2003, Olis' co-defendants, Foster and Sharkey, entered guilty pleas.[15]  Yates learned a few days before Foster and Sharkey were rearraigned that they had decided to plead guilty; Yates believed that their decision was prompted by Dynegy's decision to sop funding their defense.[16]  Following Foster's and Sharkey's rearraignments, Olis and the government submitted a joint motion asking the court to declare the case "complex,"[17] and the trial date was reset to November 3, 2003.[18]  The next week Olis' defense team received from the government electronic versions of all the relevant documents scanned onto CDs in a searchable format.[19]

On August 7, 2003, Yates sent Dynegy a bill totaling $15,081.83.  Dynegy paid this bill within two weeks by wiring funds into Yates' operating account.[20]

On August 13, 2003, Olis' defense team went to the United States Attorney's Office (USAO) to pick up copies of

---

[15]See Docket Entry Nos. 51-52 (Foster) and 54-55 (Sharkey).

[16]Yates' Testimony, Exhibit D attached to Docket Entry No. 318, pp. 47:7-25, 52:9-21.

[17]See Joint Motion, Docket Entry No. 60.

[18]See Minute Entry from Motion Hearing held on August 8, 2003, Docket Entry No. 57.

[19]Yates' Testimony, Exhibit D attached to Docket Entry No. 318, p. 56:3-23.

[20]Id. at 56:24-59:5, 73:8-16.  Copies of Yates' August 7, 2003, bill and the notice that it was paid electronically on August 20, 2003, are included in Exhibit AA attached to Docket Entry No. 318.

relevant documents.  Upon arriving at the USAO they were invited to
visit with the prosecution team and were asked to wait in the
Project Alpha room.  While there they discovered a copy of the
August 7, 2003, bill that Yates had submitted to Dynegy.  During
the ensuing meeting the prosecutors pressured for Olis to plead
guilty.  In response, Yates suggested that Olis receive immunity
for testifying against other alleged co-conspirators and that the
government seek a superceding indictment that did not name Olis.[21]
Yates did not ask the prosecutors how they had acquired a copy of
his fee bill.

When Yates returned to his office he received a hand-delivered
letter from Dynegy addressed to Olis from Dynegy's General Counsel,
Carol Graebner, stating that beginning on August 18, 2003, fees for
defense services and expenses would no longer be advanced but,
instead, deposited in an escrow account until such time as Dynegy's
board of directors determined that Olis was entitled to receive
them.[22]  Yates phoned Cracraft to ask if the letter meant that
Dynegy was changing its agreement to pay him directly, and to ask
if she had provided the government a copy of his fee bill.

Yates testified that Cracraft responded to his question about
Dynegy's agreement to pay him directly in a noncommittal manner

---

[21]Id. at 60:12-62:24.

[22]Id. at 63:11-67:20.  A copy of the August 13, 2003, letter
to Olis from Dynegy's Carol Graebner is included in Exhibit AA
attached to the Kelly Declaration.

stating only that she would check with her boss, Graebner, and get
back with him.[23]  Yates testified that after that conversation he
never spoke to Cracraft again.[24]  However, Yates also testified that
after re-reading Graebner's letter he interpreted it to mean that
Dynegy would no longer pay defense fees directly to him but,
instead, would secure funds for paying defense fees by depositing
them into an escrow account.  Yates testified that although he did
not have time to check all of the references to underlying
documents such as Dynegy's Articles of Incorporation, he understood
the letter to reflect an attempt by Dynegy to comply with the
Thompson memorandum.[25]  Yates explained that if the funds to pay his
fees were placed in escrow such that his bills would be paid by an
escrow agent, Dynegy could truthfully tell the government that it
was no longer paying for Olis' defense.[26]  Yates testified that he
did not understand the letter or Cracraft's noncommittal response

---

[23]Id. at 68:4-23, 72:5-18.

[24]Id. at 71:10-13, 72:17-18, 74:7-14.

[25]Id. at 65:20-25.  The Thompson Memorandum was a policy
statement authored by the Department of Justice articulating
principles governing discretion to indict business organizations.
See United States v. Stein, 541 F.3d 130, 136-37 (2d Cir. 2008).
Specifically, the Thompson Memorandum stated that prosecutors could
consider "'a corporation's promise of support to culpable employees
and agents, either through the advancing of attorneys fees, . . .
in weighing the extent and value of a corporation's cooperation."
Id. (quoting Memorandum from Larry D. Thompson, Deputy Attorney
General, United States Department of Justice cited in Principles of
Federal Prosecution of Business Organizations (Jan. 20, 2003), at
VI).

[26]Id. at 65:25-66:25.

to his question to mean that Dynegy did not intend to pay his fees for defending Olis.[27]  Yates stated that only in March of 2004 did he begin to suspect that Dynegy's use of escrow was not intended to secure payment for Olis' defense but, instead, to deny payment.[28]

In response to Yates' question about how the government had acquired a copy of his fee bill, Cracraft advised Yates to "[a]sk Larry Finder."[29]  Yates never followed up by asking Finder how the government had acquired a copy of his fee bill.  Yates testified that he thought the government had purposely left the copy of his fee bill out where he would see it in an effort to intimidate him and pressure Olis to plead guilty,[30] and that after learning that the government had access to his fee bill he was cautious about sending additional bills to Dynegy for payment.[31]

On October 2, 2003, Yates prepared a second invoice to Dynegy for services provided to Olis during July of 2003 totaling $105,176.78.[32]  Although Yates testified that he thought he sent this second invoice to Dynegy in October of 2003, the facsimile

---

[27]Id. at 64:3-5, 65:4-5, 67:11-14, 84:12-17.

[28]Id. at 83:21-84:11.

[29]Id. at 68:24-69:4.  See also id. at 70:11-24.

[30]Id. at 61:5-15.

[31]Id. at 72:23-25.  See also id. at 75:11-14 (Where Yates testified, "But when I found out they had my billing records, then I just – told them basically hold up everything.  We need to figure out what's going on over there before I ship them another bill.").

[32]This multi-page invoice is included in Exhibit AA attached to Docket Entry No. 318 and Bates stamped, Dyn 001048-001057.

cover sheet from Yates attached to the copy included in the record
before the court is dated November 17, 2003,[33] which was four days
after Olis' trial concluded on November 13, 2003.  The "comments"
section of the cover sheet states:

> Attached please find a copy of the July 2003 invoice for
> the Olis matter.  As discussed, the invoice is dated
> October 2, 2003, but the invoice reflects legal services
> and expenses incurred during July 2003.  Dynegy has
> represented in correspondence that payment for legal
> services and expenses incurred prior to August 17, 2003
> would be paid to our offices.  Please provide payment
> accordingly for the July services.  Thank you for your
> attention to this matter.[34]

Cracraft approved payment of this bill on November 19, 2003, and on
November 21, 2003, Dynegy paid the bill by wiring funds into Yates'
operating account.[35]

Olis' jury trial began on November 3, 2003, and ended on
November 13, 2003, with convictions on all counts of the
indictment.[36]  In late November of 2003 Yates advised Olis to hire

---

[33]_Id._, at page Bates stamped Dyn 001047.

[34]_Id._

[35]_Id._ at page Bates stamped Dyn 001046.  But see Yates'
Testimony, Exhibit D attached to Docket Entry No. 318, pp. 75:1-
77:25 (stating that he thought he sent his second bill to Dynegy in
October of 2003, that instead of paying him the amount billed
Dynegy mistakenly placed that amount in escrow, but did finally pay
the invoice on November 21, 2003), and p. 83:8-12 (stating that he
had to re-send this bill).

[36]See Trial Transcripts:  Day 1, Docket Entry No. 122; Day 2,
Docket Entry No. 97; Day 3, Docket Entry No. 98; Day 4, Docket
Entry No. 99; Day 5, Docket Entry No. 102; Day 6, Docket Entry
No. 103; Day 7, Docket Entry No. 104; Day 8, Docket Entry No. 105.
See also Verdict, Docket Entry No. 92.

another lawyer to appeal his convictions, and Olis hired David
Gerger.[37] Sometime after the trial Yates also advised Olis that he
would need to have an expert to testify about the amount of loss
because amount of loss was a significant factor for the sentencing
guidelines. Olis provided Yates $50,000 to hire an expert, which
Yates deposited in his trust account.[38] In late 2006 Yates returned
the $50,000 to Olis because the experts who participated in Olis'
sentencing hearings did not charge for their services or expenses.[39]

In December of 2003 Yates prepared his third invoice to Dynegy
for services provided to Olis from August 1-17, 2003, totaling
$98,517, which Dynegy paid on February 12, 2004.[40]

In April of 2004 Yates prepared his fourth and final bill to
Dynegy, totaling $448,556, for services provided to Olis at both
the guilt-innocence and sentencing phases of his trial. When by
June of 2005 Dynegy failed either to pay this bill or to respond to
his inquiries about why it had not been paid, Yates sued Dynegy in
state court.[41] During litigation of this lawsuit against Dynegy,

---

[37]Yates Testimony, Exhibit D attached to Docket Entry No. 318,
p. 82:10-21.

[38]Id. at 92:5-21.

[39]Id. at 93:25-95:22.

[40]Id. at 79:1-4, 80:6-13, 210:12-23.

[41]Id. at 227:25-229:5 (stating that the last bill was for
services provided between August 18, 2003, and April 7, 2004);
88:15-90:21 (Dynegy neither paid Yates nor disputed his bills);
119:4-5 and 137:10-12 (identifying amount of Yates' last bill).

Yates learned that Olis' prosecutors, including the former United States Attorney for the Southern District of Texas, Michael Shelby, had pressured Dynegy to stop advancing funds for Olis' defense. Documents produced during discovery include a January 17, 2003, letter from Shelby to Dynegy's President and CEO, Bruce Williamson, memorializing a January 10, 2003, meeting at which Dynegy's outside counsel, Lawrence Finder and Joseph Cialone, expressly approved Shelby and Williamson having direct contact,[42] and e-mails exchanged by Shelby and Williamson on July 18 and 19, 2003, about Dynegy's decision to stop advancing funds for Olis' defense.[43]

Finder testified that on July 15, 2003, the lead prosecutor on Olis' case, Jimmy Sledge, and Sledge's supervisor, Quincy Ollison, telephoned Finder and asked him why Dynegy was paying Olis' attorneys' fees,[44] and directed Finder to provide Sledge and Ollison a copy of the statute that governed such payments by Illinois corporations such as Dynegy.[45]  Finder testified that he provided Sledge and Ollison a copy of the Illinois statute[46] and that about two days later they told him, "[w]e read the Illinois law and it

---

[42]Exhibit Q attacked to Docket Entry No. 318.

[43]See Exhibits V and W attached to Docket Entry No. 318.

[44]Testimony of Lawrence Finder, Exhibit G attached to Docket Entry No. 318, pp. 137:7-139:5.

[45]Id. at 139:5-11.

[46]Id. at 139:10-11, 149:1-21.  See also § 8.75 of the Illinois Business Corporation Act, Exhibit U attached to Docket Entry No. 318.

-16-

seems Dynegy isn't obligated under [the] Thompson [memorandum] to pay the Attorneys' fees."[47]  Finder testified that he related his conversation with Sledge and Ollison about Olis' attorneys' fees to Dynegy and that on July 23, 2003, he received from Dynegy and forwarded to Olis' prosecutors a resolution passed by Dynegy's board of directors[48] pursuant to which all future advancements of expenses, including attorneys' fees, incurred by Olis would be remitted to an escrow account and would remain in escrow until Dynegy's board of directors determined that Olis had acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of Dynegy and that Olis had no reasonable cause to believe that his conduct was unlawful.[49]

## IV.  Analysis

Olis argues that he has been wrongfully convicted and that his sentence should be vacated, set aside, or corrected because (1) the United States violated his Fifth and Sixth Amendment rights to present the defense of his choice by pressuring Dynegy to stop advancing funds to pay the cost of his defense, and (2) he received constitutionally inadequate assistance of counsel at trial and on direct appeal.  The United States argues that Olis' § 2255 motion

---

[47]Id. at 152:3-5.

[48]Id. at 157:8, 163.

[49]Resolution 2003-7 of the Board of Directors of Dynegy Inc., Exhibit X attached to Docket Entry No. 318.

should be summarily denied because the record before the court establishes that he is entitled to no relief.

## A.  Defense of Choice

Citing United States v. Stein, 435 F.Supp.2d 330 (S.D.N.Y. 2006) (Stein I), United States v. Stein, 495 F.Supp.2d 390 (S.D.N.Y. 2007) (Stein IV), and United States v. Stein, 541 F.3d 130 (2d Cir. 2008), Olis argues that the United States violated his Fifth and Sixth Amendment rights by using the threat of indictment to pressure Dynegy to stop advancing funds to pay the cost of his defense.[50]  Olis contends that the government's pressure on Dynegy violated his constitutional rights by (1) depriving him of due process of law in violation of the Fifth Amendment[51] and (2) interfering with his right to expend resources legally available to him on the defense of his choice.[52]  The government argues that these claims are procedurally barred or subject to

---

[50]Memorandum of Points and Authorities in Support of Jamie Olis' Motion to Set Aside his Conviction Pursuant to 28 U.S.C. § 2255 (Olis' Points and Authorities), Docket Entry No. 315, pp. 31-69; Jamie Olis' Response to Government's Answer and Motion for Summary Judgment, and Motion for Reconsideration of Olis' Motion for Discovery (Olis' Response), Docket Entry No. 349, pp. 2-27; and Second Notice of Supplemental Authority Supporting Petitioner Jamie Olis' Motion to Set Aside His Conviction Pursuant to 28 U.S.C. § 2255, Docket Entry No. 360 (providing the court a courtesy copy of the Second Circuit's Stein opinion).

[51]Olis' Points and Authorities, Docket Entry No. 315, pp. 45-51; Olis' Response, Docket Entry No. 349, pp. 22-27.

[52]Olis' Points and Authorities, Docket Entry No. 315, pp. 51-52; Olis' Response, Docket Entry No. 349, pp. 15-22.

dismissal because the government's actions did not violate Olis' constitutional rights.[53]

### 1. Procedural Bar

When a defendant raises an issue for the first time during collateral review he must ordinarily "show both cause for his procedural default and actual prejudice resulting from the error." United States v. Gaudet, 81 F.3d 585, 589 (5th Cir. 1996). See also Cervantes, 132 F.3d at 1109, and Frady, 102 S.Ct. at 1594. "This cause-and-actual-prejudice standard is significantly more rigorous than even the plain error standard . . . applied on direct appeal." Id. The procedural bar does not apply, however, to a claim that could not have been raised on direct appeal, such as those alleging ineffective assistance of counsel. United States v. Pierce, 959 F.2d 1297, 1301 (5th Cir.), cert. denied, 113 S.Ct. 621 (1992). For the reasons explained below, the court concludes that Olis has established cause for his procedural default, but has not established actual prejudice.

### (a) Cause

Olis argues that he could not have raised his claim for governmental interference with his ability to fund his defense prior to trial or on appeal because neither he nor his attorneys

---

[53]United States' Answer to Motion to Vacate Pursuant to 28 U.S.C. § 2255, Motion for Summary Denial, and Supporting Memorandum of Law (United States' Memorandum), Docket Entry No. 346, pp. 8-41.

knew that the government had pressured Dynegy to stop funding his defense.  Olis asserts that it is not his contention that the Thompson memorandum alone violated his constitutional rights but, instead, it was the way his prosecutors improperly used the Thompson memorandum to threaten Dynegy that constituted the violation.  Citing Yates' testimony, Olis argues that he was not aware of the government's actions and that "[i]f [he] had had any idea . . . [that the government had pressured Dynegy, he] would [have] filed a motion, [and] gone in front of Judge Lake[,] and asked him to intervene."[54]  Similarly, citing excerpts from the testimony of Yates and Finder (Dynegy's outside counsel), the government argues that Olis is unable to show cause for not having raised this issue before now because prior to his trial Olis possessed, or by reasonable means could have obtained, facts needed to raise this claim.[55]  The court disagrees.

A § 2255 petitioner has adequate "cause" for failing to raise a constitutional claim when there existed "some external impediment preventing counsel from constructing or raising the claim." McCleskey v. Zant, 111 S.Ct. 1454, 1472 (1991).  To satisfy the cause standard a petitioner must show that "'some objective factor external to the defense' prevented him from raising on direct

---

[54]Yates' Testimony, Exhibit D attached to Docket Entry No. 318, pp. 84:24-85:1.

[55]United States' Memorandum, Docket Entry No. 346, pp. 10-16.

appeal the claim he now advances." <u>United States v. Guerra</u>, 94 F.3d 989, 993 (5th Cir. 1996) (quoting <u>Murray v. Carrier</u>, 106 S.Ct. 2639, 2645 (1986)).

> Objective factors that constitute cause include interference by officials that makes compliance with the procedural rule impracticable, a showing that the factual or legal basis for the claim was not reasonably available to counsel at the prior occasion, and ineffective assistance of counsel in the constitutional sense.

<u>Id.</u>  The fact that a petitioner did not possess or could not reasonably have obtained "certain evidence fails to establish cause if other known or discoverable evidence could have supported the claim in any event." <u>McCleskey</u>, 111 S.Ct. at 1472.  Moreover, "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." <u>Murray</u>, 106 S.Ct. at 2644.

The United States does not argue that Olis and/or his trial counsel knew that government prosecutors had pressured Dynegy to stop paying for Olis' defense but, instead, argues that prior to trial Olis' chief trial counsel, Yates, either possessed enough information or upon investigation could have discovered enough information to raise the claim that Olis is now raising.  Citing excerpts from Yates' testimony during trial of his state court action against Dynegy, the United States argues that prior to trial Yates knew that Dynegy had stopped paying Sharkey's attorney's fees and had decided to escrow funds to pay Olis' attorneys' fees, knew

that corporations like Dynegy were attempting to comply with the
Thompson memorandum, knew that the government had received a copy
of his first bill for services within a week of his having
submitted it to Dynegy, and knew that a pretrial procedure existed
that would have allowed him to address the impropriety of Dynegy's
decision to escrow funds for payment of Olis' defense.   Because
Dynegy's in-house attorney, Cracraft, had advised Yates to ask
Dynegy's outside counsel, Finder, about how the government had
received a copy of the first bill that he submitted to Dynegy, and
because at Yates' state court trial against Dynegy, Finder
testified about the pressures the Olis' prosecutors had exerted on
Dynegy to stop paying for Olis' defense, the United States argues
that Olis has failed to show cause as a matter of law because Yates
purposely chose not to pursue the issue with Finder.[56]

Yates' testimony is replete with evidence that before learning
that the government had a copy of the fee bill he had submitted to
Dynegy he had contacted Finder many times in an effort to acquire
documents and other relevant information but that Finder had never
been forthcoming.[57]   Although the government argues that Finder had
knowledge of the pressures that Olis' prosecutors exerted on Dynegy
to stop paying his fees, the government has failed to cite any

---

[56]Id. at pp. 16-17.

[57]See Yates Testimony, Exhibit D attached to Docket Entry
No. 318, pp. 40:8-43:14, 199:15-201:12 (explaining his unsuccessful
efforts to obtain documents from Finder).

evidence showing that Finder shared this knowledge with Yates, or that, if asked, Finder would have shared this knowledge with Yates. In light of the fact that Finder failed to share any other relevant information with Yates despite Yates' repeated attempts to acquire relevant information from Finder, the court is not persuaded that had Yates asked Finder how the government had acquired a copy of the bill that he submitted to Dynegy in August of 2003 that Finder would have told him that Olis' prosecutors had pressured Dynegy to stop paying for Olis' defense. Since it is undisputed that Olis and his attorneys only learned of the affirmative acts that his prosecutors used to pressure Dynegy to stop paying the costs of his defense during discovery for the state court trial, the court concludes that Olis has established cause for not having raised this issue on a prior occasion because on the prior occasions at which the United States argues Olis could and should have raised this claim neither Olis nor his counsel possessed a factual basis on which to do so. See Guerra, 94 F.3d at 993 (objective factors for finding cause may include a showing that the factual and legal bases for the claim was not reasonably available to counsel at the prior occasions).

### (b)   Prejudice

To satisfy the prejudice prong of the cause and prejudice standard Olis must show that but for the government's interference with his ability to fund his defense, he might not have been

with his ability to fund his defense, he might not have been convicted.  Id. at 994.  The United States argues that Olis is unable to establish the prejudice prong of the cause and prejudice analysis because the evidence of Olis' guilt was so overwhelming that he would have been convicted even if Dynegy had fully funded his defense.

Olis argues that if Dynegy had fully funded his defense his trial counsel would have been able to purchase software needed to search the electronic documents provided by the government, engage a jury consultant, and hire expert witnesses — all of which would have better prepared his counsel to defend him at trial.  As evidence that the outcome of his trial might have been different had the government not pressured Dynegy to stop advancing funds for his defense, Olis argues that had his defense been fully funded his trial counsel would have been able to hire experts who could have discredited the testimony of Jeffrey Heil regarding the amount of loss attributable to Project Alpha[58] and the testimony of James Hecker regarding the propriety of the accounting treatment accorded to Project Alpha in Dynegy's financial statements,[59] and would have been able to staff the defense team with enough attorneys to review all the evidence, investigate the facts, and prevent the errors on which his claim for ineffective assistance of counsel are based.[60]

---

[58]Olis' Points and Authorities, Docket Entry No. 315, pp. 54-63.

[59]Id. at 64-66.

[60]Id. at 66-69.

-24-

In upholding Olis' convictions the Fifth Circuit observed that "[a] reasonable jury, basing its conclusion on the testimony of Foster and Hecker, together with the incriminating e-mails among Olis and his co-indictees and a wealth of other evidence, could easily have found Olis guilty beyond a reasonable doubt of all the charged crimes." Olis, 429 F.3d at 543. Since Olis fails to demonstrate that better funding would have allowed him to refute and/or discredit Foster's testimony, or any of the incriminating e-mails exchanged with his co-conspirators, some of which plainly acknowledged that they were the only people to whom Project Alpha had been fully disclosed, the court is not persuaded that Olis has shown that but for the government's interference with his ability to fund his defense he might not have been convicted.

(c)  Conclusions

The court is persuaded that Olis has established cause for not having raised his claim that the government wrongfully interfered with his ability to fund the defense of his choosing on a prior occasion because neither he nor his counsel possessed a factual basis that would have allowed them to raise it earlier. Nevertheless, the court concludes that Olis is procedurally barred from raising this claim under § 2255 because he has failed to establish the prejudice prong of the cause and actual prejudice standard by showing that but for the government's interference with Dynegy's commitment to advance funds for the cost of his defense he might not have been convicted.

-25-

2.   Constitutional Violations

Alternatively, the court concludes that even if Olis were not procedurally barred from raising his claim that the United States violated rights guaranteed by the Fifth and Sixth Amendments by pressuring Dynegy to stop advancing funds to pay the costs of his defense and thereby interfered with his right to present the defense of his choosing, this claim would not entitle Olis to any relief because his own submissions establish that he was not prejudiced by the government's actions.

(a)   Fifth Amendment

Olis' Fifth Amendment claim is that the United States' interference with Dynegy's agreement to advance funds for his defense violated his right to due process by "unjustifiably imped[ing his] fundamental right to use resources lawfully available to him to conduct his defense to criminal charges."[61] Alternatively, Olis argues that the United States' conduct violated his substantive due process rights to a fair trial and to spend funds legally available to him to mount the defense of his choosing because that conduct involved "acts so outrageous as to 'shock the conscience.'"[62] The United States argues that Olis' Fifth Amendment claim fails because to whatever extent the right he asserts is

---

[61]Id. at 45.

[62]Id. at 47.

protected by the Constitution, it is protected by the Sixth — not
the Fifth — Amendment.[63]  Acknowledging that the Sixth Amendment
safeguards rights related to criminal prosecutions, Olis argues
that its protections do not exhaust the broader right to fairness
in the criminal process that lies at the heart of his Fifth
Amendment claim, and argues that

> if the Court were to conclude that [his] claim is not
> properly analyzed as an aspect of the right to counsel,
> the claim would not be "covered by: the Sixth Amendment,
> but may nevertheless be protected by the Fifth
> Amendment's guarantee against arbitrary and unfair
> government conduct.[64]

Olis' Fifth Amendment argument founders on the principles of
Constitutional law that (1) require the right allegedly protected
by substantive due process to be carefully described or formulated,
see Washington v. Glucksberg, 117 S.Ct. 2258, 2668 (1997), and
(2) require substantive due process claims to be invoked cautiously
such that "where 'a particular Amendment provides an explicit
textual source of constitutional protection against a particular
sort of government behavior, that Amendment, not the more
generalized notion of substantive due process, must be the guide
for analyzing those claims.'"  County of Sacramento v. Lewis, 118
S.Ct. 1708, 1714 (1998) (quoting Albright v. Oliver, 114 S.Ct. 807,
813 (1994).  Olis' description of the right that he seeks to
protect as a "fundamental right to use resources lawfully available

---

[63]United States' Memorandum, Docket Entry No. 346, p. 41.

[64]Olis' Response, Docket Entry No. 349, p. 25.

to him to conduct his defense to criminal charges" is insuffi-
ciently precise to state a Fifth Amendment claim.  As observed by
the court in United States v. Rosen, 487 F.Supp.2d 721, 737 (E.D.
Va. 2007):

> [d]istilled to its essence, defendant['s] due process
> claim is that the government treated [him] unfairly
> because it interfered with [his] liberty or property
> interest to expend [his] own funds towards [his] defense.
> Clearly, whatever protection that right receives derives
> from the Sixth Amendment, and in accordance with City of
> Sacramento, the claim must be measured by that
> Amendment's standards. . . There is no need to undertake
> a separate inquiry addressing substantive due process
> when the right is protected, to whatever extent it is
> protected, by another constitutional text.   For this
> reason, defendant['s] Fifth Amendment claim fails.

For these reasons the court concludes that Olis' claim that the
actions of the United States infringed his right to present the
defense of his choosing must be analyzed under the Sixth Amendment.

          (b)   Sixth Amendment

     The   Sixth   Amendment   provides   that   "[i]n   all   criminal
prosecutions, the accused shall enjoy the right to . . . have the
Assistance of Counsel for his defence."   The right to counsel
guaranteed by the Sixth Amendment guarantees more than the mere
presence of a lawyer at a criminal trial; it protects, inter alia,
the right of all defendants to effective assistance of counsel.
See Argersinger v. Hamlin, 92 S.Ct. 2006, 2008 (1972); and Cuyler
v. Sullivan, 100 S.Ct. 1708 (1980).   The Sixth Amendment also
protects an individual's right to choose the lawyer or lawyers he

or she desires, see Wheat v. United States, 108 S.Ct. 1692, 1697 (1988), and to use one's own funds to mount the defense that one wishes to present.    See Caplin & Drysdale, Chartered v. United States, 109 S.Ct. 2646, 2652 (1989).

Asserting that there is no evidence that Olis was denied the counsel of his choice, the United States contends that Olis must establish prejudice from the alleged Sixth Amendment violation because that violation is analogous to a claim for ineffective assistance of counsel.[65]  Citing Rosen, 487 F.Supp.2d at 721, the United States argues that Olis is entitled to no relief on his Sixth Amendment claim because the record in this case demonstrates, "as a matter of law, that the escrowing of Olis' attorneys fees by Dynegy did not impact his attorneys' performance in a manner that rendered the outcome of Olis' trial unreliable."[66]  Citing Stein I, 435 F.Supp.2d at 369, Olis argues that the United States' interference with his Sixth Amendment rights was presumptively prejudicial because like the deprivation of the right to counsel of choice at issue in United States v. Gonzalez-Lopez, 126 S.Ct. 2557 (2006), the violation of which he complains was complete irrespective of the quality of the representation he received.[67]

---

[65]United States' Memorandum, Docket Entry No. 346, pp. 37-38.

[66]Id. at 39.

[67]Olis' Points and Authorities, Docket Entry No. 315, pp. 52-53.

In Gonzalez-Lopez, 126 S.Ct. at 2563, the Supreme Court held that no showing of prejudice is required for a Sixth Amendment violation where a district court erroneously denied a defendant his retained counsel of choice by not allowing that counsel to appear pro hac vice.  The Court explained that

> [d]eprivation of the right is "complete" when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received.  To argue otherwise is to confuse the right to counsel of choice — which is the right to a particular lawyer regardless of comparative effectiveness — with the right to effective counsel — which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed.

Id.

Gonzalez-Lopez is plainly distinguishable and, therefore, not controlling here.  In Gonzalez-Lopez the court's action denied defendant his retained counsel of choice, while the alleged government interference here did not deny Olis his counsel of choice.  To the contrary, despite knowing well before trial that Dynegy had decided to stop advancing funds to pay fees for Olis' defense directly to counsel and that Dynegy had stated its intention to place those funds in an escrow account, Olis' defense counsel remained fully engaged in this case and represented Olis through trial notwithstanding the government interference of which he complains.

Recognizing this distinction Olis argues that the loss of Dynegy's fee advances had an adverse effect on his ability to mount a defense by reducing the resources available to his counsel.  In

-30-

other words, Olis claims that the loss of the Dynegy fee payments reduced his counsels' effectiveness. Olis' effectiveness argument is akin to a Sixth Amendment ineffective assistance of counsel claim. See Rosen, 487 F.Supp.2d at 734 (analogizing a similar situation to ineffective assistance of counsel claims governed by Strickland v. Washington, 104 S.Ct. 2052 (1984)). Just as a showing of prejudice is required in that Sixth Amendment context, so too, for the same reasons, should such a showing be required in this Sixth Amendment context. The court thus concludes that this is not a case like Gonzalez-Lopez in which the defendant was denied counsel of choice altogether but, instead, a case like Strickland where the claim is that counsel's effectiveness was impaired.[68]

### (1)  Presumed Prejudice

Olis argues that even if prejudice is required, it must be presumed here because the government's interference with his right to use his own resources to pay his lawyers is a "structural error" for which prejudice "is so likely that case-by-case inquiry into prejudice is not worth the cost."[69]   Olis argues that the prosecutors'

---

[68]Just as a civil tortious interference with contract claim does not give rise to a remedy when no damage resulted from the interference, so should a Sixth Amendment interference claim not give rise to a remedy absent a showing of prejudice unless, as is not the case here, the interference rises to the level of a structural defect.

[69]Olis' Points and Authorities, Docket Entry No. 315, p. 53 (citing Strickland, 104 S.Ct. at 2067).

> misconduct here worked a structural error because it is
> impossible to precisely reconstruct how Olis might have
> conducted his defense had he received full funding from
> Dynegy. It is certain, however, that the funds would
> have helped him better prepare for the unusually complex
> trial. The due process and Sixth Amendment violations
> affected the "framework within which the trial
> proceed[ed]." Gonzalez-Lopez, 126 S.Ct. at 2564.[70]

The difficulty of assessing prejudice in this case is no greater

than the difficulty of doing so in the typical ineffective

assistance of counsel case, which is now routine in federal courts.

See Strickland, 104 S.Ct. at 2069 ("If it is easier to dispose of

an ineffectiveness claim on the ground of lack of sufficient

prejudice, which we expect will often be so, that course should be

followed."). Since Olis must show prejudice to prevail on his

claim, it remains only to assess whether prejudice has occurred.

### (2)  Actual Prejudice

Olis argues that prejudice is readily shown in this case

because if he had access to funds from Dynegy

> he would have retained experts to counter the
> prosecutions' theories, investigators to investigate the
> facts and potential witnesses, and a jury consultant; he
> would have purchased a searchable database to better
> enable review of the enormous volume of discovery; and
> his attorneys would have been better prepared to meet the
> charges against him.[71]

Olis' argument is readily refuted by his own submissions because

they establish undisputedly that Dynegy's failure to advance fee

---

[70] Id.

[71] Id. at 53-54.

payments to Olis' defense counsel did not deprive Olis of the ability to present the defense of his choosing at trial.

The evidence submitted in support of Olis' § 2255 motion establishes that Dynegy paid the fee bills that Yates submitted before and immediately after trial,[72] that Yates did not bill Dynegy for Olis' trial representation until April of 2004[73] — after Olis had been sentenced — because after discovering that the government had acquired a copy of the first bill he sent to Dynegy, Yates did not want the prosecutors to discern his "game plan" from bills submitted to Dynegy.[74] The evidence establishes that Yates did not know that Dynegy did not intend to pay his fee for representing Olis at trial until Dynegy failed to pay his final bill, which he submitted in April of 2004, long after Olis' trial ended.[75] The evidence establishes that Yates and Clark performed the work

---

[72]Yates Testimony, Exhibit D attached to Docket Entry No. 318, pp. 56:24-59:5 and 73:8-16 (explaining that he submitted his first bill on August 7, 2003, and that it was paid two weeks later with funds that were wired to his operating account); pp. 74:21-77:25 and 191:6-21 and Exhibit AA attached thereto (explaining that he prepared his second bill on October 2, 2003, resubmitted it to Dynegy on November 17, 2003, and received payment for it on November 21, 2003); pp. 79:1-4, 80:6-13, and 210:12-23 (explaining that he prepared his third bill to Dynegy in December of 2003 and received payment in February of 2004).

[73]Id. at 227:25-229:5 (stating that the last bill was for services provided between August 18, 2003, and April 7, 2004).

[74]Id. at 75:11-14 (Yates testified, "[W]hen I found out they had my billing records, then I just — told them basically hold up everything. We need to figure out what's going on over there before I ship them another bill.").

[75]Id. at 227:25-229:5.

required to represent Olis.[76]  The evidence establishes that since
the amount of loss caused by Project Alpha was not only a
sentencing issue, but also the subject of a motion in limine that
the court granted, Olis' trial counsel never sought experts for the
guilt-innocence phase of Olis' trial.[77]  The evidence establishes
that Olis' trial counsel felt good about the defense put on at
trial and expected the jury to acquit Olis  because the court had
granted Olis' request for an advice-of-counsel jury instruction,
which had been the heart of Olis' defense.[78]  Olis' defense was
based on the contention that he had relied in good faith on the
advice received from Dynegy's accountants and attorneys and that he
never intended to deceive anyone.[79]  This defense was rejected by
the jury and Olis' convictions were upheld on appeal due, in large

---

[76]Id. at 122:5-6 ("We were doing the work."); 123:13-14 ("It
was tedious hard work, but we did it.").

[77]Id.  at  127:11-16,  128:13-129:1,  215:11-216:8;  Clark
Testimony, Exhibit F attached to Docket Entry No. 318, pp. 187:19-
188:9.

[78]Id. at 224:14-225:7 and 251:16-20.

[79]See also T.Tr. Day 8, Docket Entry No. 105, pp. 69:19-70:3
(Yates' final argument to the jury referencing the advice-of-
counsel instruction given on page 13 of the jury instructions:
"[M]y view of this case would be from what Judge Lake tells you on
page 13 about two-thirds down.  It's kind of a simple, simple
review of the case, which what he tells you, that if you rely on an
accountant or a lawyer — and what Judge Lake tells you is so
important.  He didn't say you have to rely on an audit accountant
or a tax accountant.  He just tells you an accountant.  They're all
the same.  And if you do so in good faith, then it obviates the
intent, it takes it away.  And that's what happened in this case.
And it's real, real simple.").

part, to the testimony of co-indictee, Gene Foster, and to the
content of incriminating e-mail messages circulated among Olis and
his co-conspirators.  Olis, 429 F.3d at 542.  When asked about the
hardships that he faced due to Dynegy's failure to advance fee
payments, Olis' chief trial counsel testified that he had
difficulty paying bills and that he lost staff in the spring of
2004, but did not testify that he had suffered any hardships that
negatively impacted his ability to defend Olis at trial.[80]

The evidence also establishes that Olis had funds available
that were deliberately not used for his defense.  Yates testified
that he never asked the Olises for money for his representation:

> I had an oral agreement I made with the Olises on June
> the 20th of 2003 that I would not charge them; Dynegy was
> paying.  And I wasn't going to break my word to the
> Olises just because Dynegy broke their word for me.  I
> was never going to charge the Olises, never have, never
> will charge the Olises.[81]

Yates testified that when he determined Olis needed an expert for
sentencing, he requested the money from Olis and his wife and they
provided him with $50,000.[82]  Undisputed evidence also established
that between 1999 and 2002 Olis earned $1,217,507 at Dynegy.[83]

---

[80]Yates' Testimony, Exhibit D attached to Docket Entry No. 318,
pp. 120:17-124:2.

[81]Id. at 91:8-13.

[82]Id. at 91:14-95:6.

[83]Testimony of Jane Jones, Dynegy's former Vice-President of
Awards and Technology, T.Tr. Day 7, Docket Entry No. 104,
pp. 191:14-193:8.

Because Olis' own evidence undisputedly establishes (1) that Dynegy paid the bills that his trial counsel submitted before and after the guilt-innocence phase of his trial, (2) that trial counsel neither asked Dynegy for funds to purchase software or to hire an expert for the guilt-innocence phase of the trial nor any attempt to seek out or obtain any of these resources for that phase of the trial, and (3) that when Olis was asked for funds to hire an expert for the sentencing phase of his trial Olis provided $50,000 for that purpose, the court concludes that Olis has failed to present any evidence showing either that he lacked funds needed to mount the defense of his choosing or that the defense presented at his trial was anything other than the defense he chose to present and would have presented even if the government had not pressured Dynegy to stop advancing funds to his attorneys.

## B.    Inadequate Assistance of Counsel

Olis argues that he received constitutionally inadequate assistance of counsel because his trial counsel (a) failed to object to the constructive amendment of the indictment, (b) failed to object to the inclusion of an admittedly biased juror on the panel and permitted the court to speak to that juror privately, (c) failed to object to legally erroneous jury instructions, and (d) failed to take other necessary steps.[84]  Olis argues that each

---

[84]Olis' Points and Authorities, Docket Entry No. 315, pp. 84-104.

of these inadequacies of counsel deprived him of his fundamental right to a fair trial and resulted in the conviction of an innocent man.

### 1.   Standard of Review

Ineffective assistance of counsel claims may be brought in a collateral proceeding under § 2255 whether or not the petitioner could have raised the claim on direct appeal.   Massaro v. United States, 123 S.Ct. 1690, 1693 (2003).   A claim of ineffective assistance of counsel can be made for the first time in a motion to vacate because it raises an issue of constitutional magnitude and as a general rule cannot be resolved on direct appeal.   Id. at 1693-94.   See also United States v. Bass, 310 F.3d 321, 325 (5th Cir. 2002).

The Sixth Amendment to the United States Constitution provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."   Ineffective assistance of counsel claims are governed by the standard set forth in Strickland, 104 S.Ct. at 2052.   To prevail Olis must make two showings:   (1) that his trial counsel's performance fell below an objective standard of reasonableness and (2) that his trial counsel's unreasonable performance prejudiced him, i.e., that the errors were so serious as to deprive him of a fair trial with a reliable result. United States v. Fuchs, 467 F.3d 889, 910 (5th Cir. 2006), cert.

denied, 127 S.Ct. 1502 (2007) (citing Strickland, 104 S.Ct. at 2064). Failure to establish either of the two prongs of the Strickland test requires a finding that counsel's performance was constitutionally effective, and courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 104 S.Ct. at 2065.

    2.   Analysis

        (a)  Constructive Amendment of the Indictment

Olis argues that his trial counsel rendered constitutionally inadequate assistance by failing to object when the government constructively amended the indictment by abandoning the theory of liability posited therein that he and his co-conspirators concealed material information from Dynegy's auditors and thereby caused Dynegy to falsely report the proceeds from Project Alpha as proceeds from operating activities instead of proceeds from financing activities.[85] Asserting that the indictment was not constructively amended, the United States argues that Olis' trial counsel's failure to object on this basis was not constitutionally inadequate because the failure to object did not fall below an objective standard of reasonableness and did not prejudice Olis.[86]

_____

   [85]Id. at 69-86; Olis' Response, Docket Entry No. 349, pp. 28-36.

   [86]United States' Memorandum, Docket Entry No. 346, p. 43.

### (1)  Applicable Law

The Fifth Amendment to the United States Constitution provides in relevant part that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  The Sixth Amendment to the United States Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and the cause of the accusation." Deriving from these rights guaranteed by the Fifth and Sixth Amendments is a defendant's "right to be tried only on charges presented in an indictment returned by a grand jury." Stirone v. United States, 80 S.Ct. 270, 273 (1960) (reversing conviction where the indictment charged obstruction of sand shipments into Pennsylvania, but the trial court allowed evidence and instructed the jury that defendant could be convicted of either obstructing shipments of sand into Pennsylvania or obstructing shipments of steel out of Pennsylvania).  Consequently, "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself."  Id. at 272 (emphasis added). Conversely, when an amendment to the indictment narrows the scope of the allegations made against a defendant, the defendant's constitutional rights are generally not violated.  See United States v. Miller, 105 S.Ct. 1811, 1819-20 (1985) ("where an indictment charges several offenses, or the commission of one

-39-

offense in several ways, the withdrawal from the jury's consideration of one offense or one alleged method of committing it does not constitute a forbidden amendment of the indictment"). <u>See also</u> <u>United States v. Robinson</u>, 974 F.2d 575, 578 (5th Cir. 1992) ("when an indictment alleges non-essential facts, the government need not prove them in order to sustain a conviction"). The Fifth Circuit has explained that a constructive amendment of the indictment "occurs when the trial court through its instructions and facts it permits in evidence allows proof of an essential element of a crime on an alternative basis permitted by the statute but not charged in the indictment." <u>United States v. Griffin</u>, 324 F.3d 330, 355 (5th Cir. 2003). <u>See also</u> <u>United States v. Young</u>, 730 F.2d 221, 223 (5th Cir. 1984) (constructive amendment occurs when "the conviction rest[s] upon a set of facts distinctly different from that set forth in the indictment").

### (2)   Indictment

The indictment charged Olis with conspiracy to commit securities fraud, mail fraud, and wire fraud, and with the underlying substantive offenses. The indictment alleged that Olis and his co-conspirators executed a plan called "Project Alpha" to falsely report financing activity as operating cash flow:

> [T]he Defendants . . . would and did conceive, design and execute a plan to borrow money: that is, to engage in a "financing activity" but make it appear that the borrowed funds were cash flow from Dynegy's "risk management activities" to create the false impression and illusion

that Dynegy's cash flows from risk-management activities
were much improved and that its earnings were of
sufficient quality to justify, maintain and increase
Dynegy's stock price, and to avoid the potentially
adverse effect of a downgrade of Dynegy's credit
rating.[87]

The indictment alleged that

The Defendants, and their coconspirators and agents, knew
and intended that, during the first nine months ending on
December 31, 2001, Project Alpha would create the
appearance of improved cash flows from risk-management
activities through the execution of an essentially
circular breakeven five-year natural gas contract between
Dynegy and a specially-created corporation, sometimes
referred to as either a Special Purpose Entity ("SPE") or
a Special Purpose Vehicle ("SPV"). Project Alpha was to
be funded with loans from financial institutions . . .
The Project Alpha Lenders expected and required full
repayment, with interest, or a similarly assured return
. . .

To ensure the Project Alpha Lenders demand of full
repayment, with interest or other assured return, the
Defendants, and their coconspirators and agents, did
secretly adopt a 100% hedging strategy and did secretly
add special "tear-up" language to the Project Alpha
transaction documents. Thus, as the Defendants and their
coconspirators and agents well knew, intended, and
believed, Project Alpha was, in fact, a loan structured
to appear as a 5-year natural gas contract that should
have been disclosed as cash flows from financing
activities:  that is, as a loan (debt) rather than as
cash flows from risk-management (operating) activities in
Dynegy's financial statements (Forms 10-Q and 10-K) for
the 2nd, 3rd, and 4th quarters of, and for the year,
2001.

The Defendants, and their coconspirators and agents, knew
and understood that Generally Accepted Accounting
Principles ("GAAP") required that an SPE be an
independent entity and that the SPE, and the financial
institutions that funded the SPE, could not be assured or
guaranteed full repayment of, or a return on, their
investment, but had to bear some risk of losing money.
The Defendants and their coconspirators and agents knew

---

[87]Indictment, Docket Entry No. 1, p. 8 ¶ 15.

this because Dynegy's auditors had warned that either a 100% hedging strategy or "tear-up" language would prevent Dynegy from reporting the cash flow from . . . Project Alpha . . . as cash flows from risk-management activities in its publicly-filed financial statements.   Notwith-standing   the   warning   of   Dynegy's   auditors,   the Defendants, and their coconspirators and agents, intended to, decided to, and did implement a 100% hedging strategy and did include "tear up" language in the Project Alpha documents to protect and to ensure that the Project Alpha Lenders would not lose money.

The Defendants, and their coconspirators and agents, did intentionally conceal from Dynegy's auditors, the SEC, Rating Agencies, lenders, market and securities analysts, and the investing public, the implementation and effect of   the   100%   hedging   strategy   and   the   'tear   up' language.[88]

According to the indictment, the defendants therefore

falsely report[ed] to the SEC, Rating Agencies, lenders, market and securities analysts, and the investing public, by means of electronic filing of Quarterly Report ("Forms 10-Q")   and   an   Annual   Report   ("Form   10-K"),   that approximately $300,000,000 of "cash flows from financing activities" were "cash flows from operating activities," or more specifically, "cash flows from Risk-management activities," throughout the last nine months of the year 2001.

The   Defendants,   and   their   coconspirators   and   agents, caused Dynegy's auditors to mail, and Dynegy did in fact receive, through the United States mail, an accounting opinion (sometimes referred to as an "SAS 50" letter) advising that Dynegy could report cash flows resulting from   the   Project   Alpha   natural   gas   contract   in   the "operating cash flows" section of Dynegy's Forms 10-Q and 10-K.   As the Defendants, and their coconspirators and agents   intended,   the   accounting   opinion   provided   by Dynegy's   auditors   and   the   representation   letter   upon which it was based, did not reflect the hedging and "tear up" features of Project Alpha that made the transaction, in fact, a financing activity:   that is, a loan (debt).[89]

_____

[88] Id. at 9-11 ¶¶ 18-21.

[89] Id. at 11 ¶¶ 21-22.

The indictment also alleged that

> [o]n or about May 10, 2001, the Defendants circulated via
> email among themselves documentation reflecting the "tear
> up" and 100% — or "back-to-back" ("BTB") — hedging
> features of the Project Alpha transaction that had been,
> and would continue indefinitely to be, concealed from
> Dynegy's auditors, the SEC, Rating Agencies, lenders,
> market and securities analysts, and the investing public,
> and the Defendants knew, acknowledged and agreed that
> this documentation should "never, never, never go to
> anyone" because they were "the only ones that have
> complete knowledge of this transaction."[90]

### (3)  Application of Law to the Facts

Asserting that "[t]he gravamen of the indictment was Olis'

participation in a scheme to achieve an incorrect and false

accounting result, and thereby to defraud 'Dynegy's auditors, the

SEC, Rating Agencies, lenders, market and securities analysts, and

investing public,'"[91] Olis argues that

> at trial the government expressly eschewed any attempt to
> demonstrate that the accounting result was improper
> because of the outside hedges and tear-ups, and instead
> focused the jury's attention exclusively on the question
> whether Olis hid facts from Jim Hecker.  The government
> thereby impermissibly amended the indictment.[92]

Olis argues that reversal of his convictions is warranted because

an objection at trial would have required acquittal since the

government did not prove the charges alleged in the indictment but,

instead, broadened the indictment such that he was convicted for a

---

[90]Id. at 11-12 ¶ 23.

[91]Olis' Points and Authorities, Docket Entry No. 315, p. 73.

[92]Id.

engagement partner at Arthur Andersen, James Hecker.[93]   Olis'
argument is based on two premises:  (1) that instead of presenting
evidence that Olis and his co-conspirators concealed material
information from Dynegy's auditors, the government presented
evidence that they concealed information from a single individual,
James Hecker;[94] and (2) that instead of presenting evidence that the
accounting treatment accorded Project Alpha violated GAAP, the
government argued that it did not need to show that Project Alpha's
accounting treatment violated GAAP, or that Olis and his co-
conspirators intended the accounting treatment to violate GAAP.[95]

(i)   Theory of Liability

Olis argues that the government constructively amended the
indictment at trial when the prosecutors

> sought to convict Olis based on a theory fundamentally
> different from the one presented in the grand jury's
> indictment.  The grand jury charged Olis with seeking to
> obtain an incorrect accounting result and cause Dynegy to
> submit false information to its "auditors," the SEC and
> investors.   At trial, the government abandoned this
> theory altogether, and made no effort to prove that Olis
> intended to submit or did submit false information to the
> EC and investors. . . [T]he government's bait-and-switch

---

[93]Id. at 82 n.24.

[94]Id. at 75 asserting that "[t]he evidence at trial did not
prove the allegations in the indictment.  There was no proof . . .
that Olis agreed to deceive Andersen — Dynegy's 'auditors.'"

[95]Id. (asserting that "[t]he evidence at trial did not prove
the allegations in the indictment.   There was no proof that
Dynegy's accounting treatment violated GAAP or was improper because
of the outside hedges or tear-ups, [or] that Olis intended to
violate GAAP").

cannot stand — it violated Olis' Fifth Amendment rights, and requires reversal per se.[96]

As evidence that the government changed the fraud-on-Dynegy's auditors theory of liability alleged in the indictment to a fraud-on-Hecker theory evidenced at trial, Olis cites Hecker's testimony that "Dynegy nor any other company doesn't care what my opinion on accounting is individually.    They want to know what Arthur Andersen['s] opinion is and Arthur Andersen's interpretation of generally accepted accounting principles."[97]  Missing from Olis' brief is any mention of Hecker's testimony that he was the Arthur Andersen engagement and audit partner who had "ultimate responsibility"[98] not only to "judge whether the transaction and the accounting proposed by the company [wa]s appropriate within the accounting rules that apply,"[99] but also to execute the SAS-50 opinion by signing "Arthur Andersen"[100] and thereby expressing Arthur Andersen's "agreement that Project Alpha could be reported as operating cash flow . . . in the financial statements of Dynegy for the year 2001."[101]  Also missing from Olis' brief is any mention

---

[96]Id. at 81-82.

[97]Id. at 71 n.21 (citing Hecker Testimony, T.Tr. Day 5, Docket Entry No. 102, p. 10:6-12).

[98]Hecker Testimony, T.Tr. Day 5, Docket Entry No. 102, p. 7:18.

[99]Id. at 7:23-25.

[100]Id. at 10:12 ("I signed the firm name, definitely.").

[101]Id. at 8:25-9:5:

> Q    Basically the SAS-50 was the firm's acknowledgment
>      or agreement that Project Alpha could be reported
>                                           (continued...)

of Gene Foster's testimony (1) that he and his co-conspirators knew that without the SAS-50 opinion executed by Hecker, Dynegy would have reported the proceeds from Project Alpha as proceeds from financing activity instead of proceeds from operations,[102] (2) that they knew that if they disclosed the outside hedges and tear-up agreements to Hecker he would not execute the SAS-50 opinion,[103] and (3) that they knew that by concealing the outside hedges and tear-up agreements from Hecker, they would prevent Project Alpha from being fully disclosed not just to Hecker but also to Arthur Andersen and others, including the credit rating agencies.[104]

---

[101](...continued)

> as operating cash flow on the financial, in the financial statements of Dynegy for the year 2001?

A    Yes, that was one of the important conclusions.

[102]When asked whether Dynegy needed Arthur Andersen's opinion in order to describe the $300 million realized from Project Alpha as proceeds from operations in Dynegy's financial statements if Dynegy's internal accountants were satisfied with that accounting treatment, Foster responded that Dynegy "needed the Arthur Andersen opinion. It was required. It was my understanding that we had to have the SAS-50 opinion." T.Tr. Day 7, Docket Entry No. 104, p. 103:5-7.

[103]Foster explained that the way he and his co-conspirators "rationalized hiding these documents from [Arthur] Andersen, was that as long as the internal accountants were happy with it, it was our hope that ultimately the accounting would survive." T.Tr. Day 7, Docket Entry No. 104, p. 106:7-10.

[104]Foster testified that he and his co-conspirators knew that by failing to disclose the outside hedges and linked tear-ups to Hecker, they prevented Project Alpha from being fully disclosed not just to Hecker, but also to others, including the credit rating agencies:

> Q.    Is it true that Alpha I was not fully disclosed to the credit rating agencies?

> (continued...)

Because the evidence presented at trial proved undisputedly that Hecker was the only Arthur Andersen employee with authority not only to judge the propriety of the accounting treatment accorded to Project Alpha, but also to sign Arthur Andersen's name to the SAS-50 opinion, which Dynegy needed to report Project Alpha's proceeds as proceeds from operations, and that Olis and his co-conspirators knew that by concealing the outside hedges and tear-up agreements from Hecker they would prevent Project Alpha from being fully disclosed not just to Hecker but also to Arthur Andersen and others, including the credit rating agencies, Olis' argument that the government constructively amended the indictment by proving fraud-on-Hecker instead of proving fraud-on-Dynegy's auditor, Arthur Andersen, has no merit.  Business organizations like Arthur Andersen can only act through their employees, and

---

104 (...continued)
A.   Yes.

Q.   Explain.

A.   When you look at the financial statements, Alpha I, the Alpha transaction was shown as operating cash flow, and there was no disclosure in those financial statements to show as anything other than operating cash flow.

Q.   Is it your belief that if Mr. Hecker had known about the tear-ups, he would have required the company to report Alpha as debt instead of operating cash flow?

A.   Yes.

T.Tr. Day 7, Docket Entry No. 104, p. 19:7-18.

-47-

acting in his official capacity, Hecker was Arthur Andersen for purposes of the accounting treatment accorded to Project Alpha. Accordingly, the court concludes that no constructive amendment occurred by virtue of the fact that the government presented evidence that Olis and his co-conspirators concealed the outside hedges and tear-up agreements from Hecker because this evidence did not broaden either the theory of liability or the factual basis alleged in the indictment. Young, 730 F.2d at 223.

(ii)  Failure to Prove Factual Allegations

Olis argues that

[t]he evidence at trial did not prove the allegations in the indictment.  There was no proof that Dynegy's accounting treatment violated GAAP or was improper because of the outside hedges or tear-ups, that Olis intended to violate GAAP, or that Olis agreed to deceive Andersen — Dynegy's "auditors."

As discussed, the government did not even attempt to argue that the outside hedges and linked tear-ups — to which Hecker objected — rendered Dynegy's accounting for Project Alpha wrong, or meant that the cash flows derived from Project Alpha should properly have been classified as income from financing.   In fact the evidence demonstrated the opposite.[105]

After reciting evidence that he argues contradicts "the indictment's charges that [he] agreed to hide the outside hedges and tear-ups from Andersen as an institution and to disseminate

---

[105]Olis' Points and Authorities, Docket Entry No. 315, pp 75-76.

false financial statements,"[106] Olis argues that "[t]he government could not have convicted [him] of the charges in the indictment."[107]

Olis' argument that the government constructively amended the indictment by failing to prove all of the factual allegations contained therein is an argument that the Supreme Court rejected in Miller, 105 S.Ct. at 1811. Miller had been indicted for various allegedly fraudulent acts associated with a burglary at his place of business, including consenting to the burglary and lying to his insurer about the value of his loss. Id. at 1813. At trial, the prosecution submitted evidence only as to the latter alleged fraud and submitted no proof whatsoever as to the theory that he had consented to the burglary. Id. While the proof clearly supported the jury's finding that Miller was guilty of the one act that was both alleged in the indictment and litigated at trial, Miller nonetheless complained "not that the indictment failed to charge the offense for which he was convicted, but that the indictment charged more than was necessary" and, thus, that the government was required to prove all that had been alleged. Id. at 1817. The Court rejected that argument, ruling that "[a]s long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment

---

[106]Id. at 78.

[107]Id.

alleges more crimes or other means of committing the same crime."
Id. at 1815.

In rejecting Miller's challenge the Court acknowledged the
distinction between an amendment of the indictment that broadens
its scope and one that narrows its scope.  Id. at 1818.  The Court
clarified that while no one other than the grand jury is permitted
to broaden the scope of an indictment, there is no prohibition
against narrowing the indictment at trial.

> Modern criminal law has generally accepted that an
> indictment will support each offense contained within it.
> To the extent that [Ex parte Bain, 121 U.S. 1, 7 S.Ct.
> 781, 30 L.Ed. 849 (1887)] stands for the proposition that
> it constitutes an unconstitutional amendment to drop from
> an indictment those allegations that are unnecessary to
> an offense that is clearly contained within it, that case
> has simply not survived.  To avoid further confusion, we
> now explicitly reject that proposition, although . . . we
> do not limit Bain's more general proposition concerning
> the impermissibility of actual additions to the offenses
> alleged in an indictment, a proposition we have
> repeatedly reaffirmed.
>
> An indictment is amended when it is so altered as to
> charge a different offense from that found by the grand
> jury.   But here there was no alteration of the
> indictment, nor did the court's action, in effect, add
> anything to it by submitting to the jury matters which it
> did not charge. . . [W]here an indictment charges several
> offenses, or the commission of one offense in several
> ways, the withdrawal from the jury's consideration of one
> offense or one alleged method of committing it does not
> constitute a forbidden amendment of the indictment. Were
> the rule otherwise, the common practice of withdrawing
> from the jury's consideration one count of an indictment
> while submitting others for its verdict . . . would be a
> fatal error.

105 S.Ct. at 1819-20 (citations omitted).  Pursuant to Miller the
government had the right to narrow the indictment by presenting

only the evidence necessary to prove the essential elements of the crimes charged; the inclusion of additional facts in the indictment did not obligate the government to prove them.

The scheme to defraud alleged and proved in this case did not turn on whether the treatment accorded to Project Alpha in Dynegy's financial statements technically complied with GAAP or whether Olis and his co-conspirators intended to violate GAAP but, instead, on whether the defendants' disclosures about Project Alpha intentionally omitted material facts that caused Dynegy's financial statements to be materially false and misleading. See United States v. Rigas, 490 F.3d 208, 221 (2d Cir. 2007), cert. denied, 128 S.Ct. 1471 (2008) ("Even if [d]efendants complied with GAAP, a jury could have found, as the jury did here, that [d]efendants intentionally misled investors . . ."); United States v. Ebbers, 458 F.3d 110, 125-26 (2d Cir. 2006), cert. denied, 127 S.Ct. 1483 (2007) (explaining that the issue in relation to allegedly false financial reports is not whether an argument could be made that the accounting was permissible under particularized rules, but whether the use of the accounting rules led to a financial statement that was materially misleading, and recognizing that materially misleading financial statements violate GAAP).

As in Rigas and Ebbers, the government did not need to prove that Dynegy's accounting for Project Alpha violated GAAP in order to prove that Dynegy's financial statements were materially false

and misleading because Olis and his co-conspirators intentionally
concealed material information from Arthur Andersen and others.
Thus, the government did not constructively amend the indictment by
telling the jury that Olis could be convicted regardless of whether
the accounting treatment accorded to Project Alpha violated GAAP,
that Olis and his co-conspirators intended to violate GAAP, or that
Hecker's application of GAAP to Project Alpha was correct.  See
Miller, 105 S.Ct. at 1815 ("[a] part of the indictment unnecessary
to and independent of the allegations of the offense proved may
normally be treated as 'a useless averment' that 'may be
ignored'").

Olis' conclusion that "[t]he government could not have
convicted [him] of the charges in the indictment," does not support
his claim that the government constructively amended the indictment
but, instead, restates the sufficiency of the evidence argument
that he raised and the Fifth Circuit rejected on direct appeal:

> Olis contends, almost perfunctorily, that the evidence
> does not support his conviction.  In particular, he
> disputes the proof that he conspired to conceal two
> critical features of Project Alpha from Dynegy's outside
> auditor Arthur Andersen—the "parent level" hedge and the
> "tear-up" agreements.  This court will not disturb a
> jury's verdict unless the record demonstrates that a
> rational jury could not have found each of the elements
> of the offense beyond a reasonable doubt.  United States
> v. Dahlstrom, 180 F.3d 677, 684 (5th Cir. 1999). . .
>
> Olis asserts that the evidence demonstrated that everyone
> working on Project Alpha, including Arthur Andersen
> accountants, knew that the bank owners of ABG Gas were
> fully hedged against the risk of loss from variable gas
> prices.  Olis's boss Foster, testified, however, as a

star prosecution witness and co-indictee, that he and Olis wrongly agreed to the tear-ups and the parent hedge and hid them from Arthur Andersen. Jim Hecker, an audit partner at Arthur Andersen, testified that he advised Dynegy against tear-ups, and Dynegy subsequently did not reveal this aspect of Project Alpha to him. A reasonable jury, basing its conclusion on the testimony of Foster and Hecker, together with the incriminating emails among Olis and his co-indictees and a wealth of other evidence, could easily have found Olis guilty beyond a reasonable doubt of all the charged crimes.

Olis, 429 F.3d at 542-43.[108]

### (4) Conclusions

For the reasons explained above, the court concludes that the government did not constructively amend the indictment by changing the theory of liability or by failing to prove that the accounting treatment accorded to Project Alpha violated GAAP and that Olis and his co-conspirators intended to violate GAAP. Because the government did not constructively amend the indictment, Olis' trial counsel did not render constitutionally inadequate assistance of counsel by failing to object on this basis.

### (b) Biased Juror

Olis argues that the assistance of counsel he received both at trial and on appeal was constitutionally ineffective because his

---

[108]As recognized by the Fifth Circuit, any doubt that Olis and his co-conspirators conspired to conceal the outside hedges and tear-up agreements from Arthur Andersen and others in an effort to prevent Project Alpha from being fully disclosed is dispelled by Foster's testimony that the co-conspirators actively sought to prevent documents from the Project Alpha operations manual from being distributed even to other Dynegy employees for fear that they would fall into the hands of Arthur Andersen. See e-mail messages circulated among co-conspirators described above at p. 2 n.1.

counsel failed to object to or appeal from the seating of an admittedly biased juror, and the court's ex parte communications with that juror.

### (1)   Factual Background

Olis asserts that at the end of the first day of trial a juror informed the court that the trial schedule could pose an obstacle to the juror's obligation to pick up her daughter from school.  The court told counsel that he had discussed the issue with the juror and thought that the issue had been worked out.[109]  However, after testimony resumed the next day, the court informed counsel during a sidebar conference out of Olis' presence that the same juror had sent the court a note in which she stated:

> I am sorry to inform you that I will not be able to judge this case fairly, knowing that my boss will not pay me for missed days and how my child will be getting home from school, because my income is the main source for my household.  So, it is not fair for all that I remain on the jury.  So, I am asking you to please dismiss me from this case.[110]

Suggesting that the $40 per day stipend paid to the juror was likely in the range of the juror's daily income, the court proposed that the juror remain on the panel and be paid weekly.  Olis' counsel stated that this arrangement was "acceptable with the defense."[111]  When the government indicated some concern with the

---

[109]T.Tr. Day 1, Docket Entry No. 122, p. 111:3-16.

[110]T.Tr. Day 2, Docket Entry No. 97, pp. 121:23-122:4.

[111]Id. at 122:14.

court communicating ex parte with the juror, the court explained
its reasons:

> Certainly you're supposed to be careful.  The problem is
> sometimes if you bring the juror into the courtroom, we
> can't close the courtroom, so all the spectators would be
> here and all the attorneys would be here.  It has a high
> level of embarrassment about a personal, financial and
> family matter.  So, my normal procedure is to talk to the
> juror, find out what the facts are, communicate with
> counsel, get counsel's concurrence, and then communicate
> back.
>
> In certain situations if I think the juror has
> potentially been tainted from an outside source, I will
> bring the juror in and have a question and answer in the
> courtroom.  But I prefer to start on this basis.  So,
> you-all do your research, I'll look at mine.
>
> I'm comfortable that this procedure is appropriate, but
> I understand you've got a lot invested in this case and
> want to be careful, so that's fine.[112]

During another sidebar conference held later that day, all counsel
agreed that the court should communicate to the juror ex parte the
decision that she remain on the panel.  After that ex parte
communication occurred, the court informed counsel that the juror
had stated her daily income as $80 per day, and that the court had
suggested she ask her boss to make up the difference.  Although the
court reported that the juror was not happy with that outcome, the
juror remained on the panel through the verdict.[113]

---

[112]Id. at 123:1-16.

[113]Id. at 223:18-225:7.

-55-

####         (2)    **Analysis**

######             (i)   Juror Bias

Citing <u>United States v. Hughes</u>, 258 F.3d 453, 459 (6th Cir. 2001), Olis argues that

> where a juror makes an "open declaration of her inability to be fair," and neither the court nor counsel makes "any attempt at clarification or rehabilitation, there is no ambiguity in the record as to her bias; [the juror's] express admission is the only evidence available to review."[114]

Citing in addition, <u>Virgil v. Dretke</u>, 446 F.3d 598 (5th Cir. 2006), and <u>United States v. Nell</u>, 526 F.2d 1223 (5th Cir. 1976), Olis argues that courts have reversed convictions by juries that included one or more people who had expressly confessed bias.[115]

In <u>Hughes</u> a juror stated that because her nephew was a police officer and she knew other officers, "I don't think I could be fair."  258 F.2d at 456.  In <u>Virgil</u> one juror stated that "his relationship with law-enforcement officers would preclude him from serving as an impartial juror," and another stated that because his mother had been mugged, he could not be "fair and impartial" in a case involving an assault on an elderly person.  446 F.3d at 609-10.  In <u>Nell</u> — a case involving unions — one juror stated that he was biased because he disliked unions, and another generally disclosed a possible association with the defendant.  526 F.2d at

---

[114]Olis' Points and Authorities, Docket Entry No. 315, p. 90.

[115]<u>Id.</u>

-56-

1227-29.   "Both the Sixth Circuit in <u>Hughes</u>, and this Court, in <u>Nell</u>, found it telling that neither venireperson ever stated that they would be able to render a fair and impartial verdict." <u>Virgil</u>, 446 F.3d at 607.   Olis argues that the facts of these cases are similar to those of this case because "in each case neither counsel nor the trial court rehabilitated the jurors or otherwise made any substantial efforts to assure that the jurors could set aside their biases and judge the case fairly."[116]   Olis argues that "the inclusion of the admittedly biased juror on [his] panel violated his Sixth Amendment right to an impartial jury,"[117] and that counsel's failure to object to the inclusion of an admittedly biased juror constitutes ineffective assistance.[118]

The right of a defendant to a fair and impartial jury is a fundamental element of due process.   <u>Id.</u> at 605.   In <u>Virgil</u> the Fifth Circuit held that permitting admittedly biased jurors to convict the defendant deprived him of his Sixth Amendment right to a fair trial by an impartial jury, and that counsel's failure to challenge these jurors for cause amounted to deficient performance that was presumptively prejudicial.   <u>Id.</u> at 608-14.   However, the court did not find ineffectiveness with regard to the failure to remove jurors whose answers, considered in context, did not

---

[116]<u>Id.</u>

[117]<u>Id.</u> at 91.

[118]<u>Id.</u> at 93.

evidence bias against the defendant or the circumstances of his particular case.  Id. at 609.  In Irvin v. Dowd, 81 S.Ct. 1639 (1961), the Supreme Court stated the test for determining juror bias is "whether the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality."  Id. at 1643 (citing United States v. Reynolds, 98 U.S. 145, 155 (1878) ("The theory of the law is that a juror who has formed an opinion cannot be impartial.").  While jurors may also be found to have implied bias, such a finding must be premised upon a conclusion about which reasonable jurists would not disagree.  Brooks v. Dretke, 444 F.3d 328, 329 n.4, and 332 (5th Cir. 2006).

Olis has neither alleged that the juror at issue was incapable of basing her decision upon the evidence presented at trial nor pointed to specific facts demonstrating such a close connection to the circumstances of his case that bias must be presumed.  The venire as a whole was asked several times whether they could return a verdict based solely on the evidence in this case.[119]  The juror in question did not indicate that she had any predisposition to convict Olis, and despite his argument to the contrary, Olis has not shown that the juror possessed a bias that would have prevented her from serving on the jury had his counsel objected.  The issue

_____

[119]T.Tr. Day 1, Docket Entry No. 122, pp. 16:6-12, 31:12-18, 47:14-48:2, and 67:1-24.

before the court is, therefore, vastly different from that at issue in Virgil and the other cases on which Olis relies.  In those cases jurors who admitted bias related to the circumstances of the case at hand were permitted to serve on the jury that convicted the defendants after counsel and the court failed to ask follow-up questions to clarify or rehabilitate the jurors' expressions of bias during voir dire.  See Virgil, 446 F.3d at 607 (observing that "[b]oth the Sixth Circuit in Hughes, and this Court, in Nell, found it telling that neither venireperson ever stated that they would be able to render a fair and impartial verdict").

Citing Turner v. Louisiana, 85 S.Ct. 546 (1965), and United States v. Maxwell, 160 F.3d 1071 (6th Cir. 1998), Olis argues that the Supreme Court has long recognized that a verdict is void if jurors develop biases during the course of the trial. However, in these cases, too, the bias at issue was specifically related either to the defendant or to the circumstances of the defendant's particular case.  In Turner the Supreme Court held that the defendant had been deprived of his right to a fair trial by an impartial jury because two deputy sheriffs who testified as key state witnesses not only had charge of the jury during the three-day trial but also fraternized with the jury outside the courtroom while acting in their official capacities.  85 S.Ct. at 550.  In Maxwell the defendant's mother testified on her son's behalf, and after the close of evidence a juror informed the court that he knew

the defendant's mother because he was her mail carrier.   The next morning the court addressed the matter by conducting a separate voir dire of the juror during which it was determined that the juror could not remain fair and impartial in deciding the case. The court allowed the juror to return to the jury box but designated him an alternate and dismissed him from participating in jury deliberations.   160 F.3d at 1076-77.

The facts of this case are starkly different from the facts in either Turner or Maxwell.   The juror at issue in this case is not alleged to have known any of the witnesses or to have had any inappropriate contact or communication with outside sources during the trial.   The juror merely expressed concern that the trial schedule would prevent her from picking her child up from school and that the stipend paid to jurors was less than her daily income. These concerns alone are not sufficient to show either that the juror was biased against Olis or that her service on the jury prejudiced him.   Concerns about childcare and income are pressures commonly experienced by jurors that cannot properly be charac-terized as bias against any particular party or bias related to the circumstances of any particular case.   Nor do these concerns reflect an inability to decide the case solely on the evidence presented at trial.   For these reasons it cannot be said that counsel's failure to object to this juror's service on Olis' jury deprived Olis of a fair trial with a reliable result.   Absent

evidence that anything changed between the voir dire during which the juror indicated her ability to be fair and impartial and to decide the case strictly on the evidence presented at trial and her expression of concern regarding childcare and income to the court, the court is not persuaded either that Olis' trial and/or appellate counsel's performance fell below an objective standard of reasonableness or that counsel's performance prejudiced Olis by depriving him of a fair trial with a reliable result. See Suarez v. Bennett, 171 Fed.Appx. 361 (2d Cir. 2006) (state court's decision to retain juror who had a family obligation on the evening of the deliberations fell within the boundaries established by Smith v. Phillips, 102 S.Ct. 940, 946 (1982), with respect to impartiality).

### (ii)   Ex Parte Communications

Olis argues that his

counsel's response to the biased juror issue was deficient for another reason: without seeking an informed waiver from Olis, counsel permitted the Court to conduct a critical stage of the proceedings out of the presence of both Olis and his counsel. Such *ex parte* conduct of critical proceedings violated Olis' due process and Sixth Amendment rights to be personally present and to have assistance of counsel, and counsel's acquiescence was therefore constitutionally ineffective.[120]

A criminal defendant's constitutional right to be present at various stages of his trial is rooted in the Confrontation Clause

---

[120]Olis' Response, Docket Entry No. 349, p. 40.

-61-

of the Sixth Amendment and, when confrontation is not at issue, the Due Process Clause of the Fifth Amendment.  See <u>United States v. Gagnon</u>, 105 S.Ct. 1482 (1985).  In addition, Federal Rule of Criminal Procedure 43 provides that a defendant must be present at "every trial stage,"  Fed. R. Crim. P. 43(a)(2), except those stages where "[t]he proceeding involves only a conference or hearing on a question of law."  Fed. R. Crim. P. 43(b)(3).

In <u>Gagnon</u> the Supreme Court reviewed a court's private <u>in camera</u> conference with a juror after the juror had expressed concern that one of the defendants, Gagnon, had been seen sketching the jury during trial.  105 S.Ct. at 1483.  After the sketch had been brought to the court's attention, the court announced that he would speak to the juror.  <u>Id.</u>  The court did so on the record in chambers in the presence of Gagnon's counsel but outside the presence of Gagnon and his co-defendants.  On appeal, Gagnon and his co-defendants claimed that the <u>in camera</u> meeting with the juror violated their rights to be present at all stages of trial.  <u>Id.</u> A divided panel of the Ninth Circuit Court of Appeals reversed the convictions of all the defendants holding that the <u>in camera</u> discussion with the juror violated their rights under Rule 43 and the Due Process Clause of the Fifth Amendment.  <u>Id.</u> at 1484 (citing <u>United States v. Gagnon</u>, 721 F.2d 672 (1983)).  Concluding that the defendants' rights under the Fifth Amendment Due Process Clause were not violated by the district court's <u>in camera</u> discussion with

the juror, the Supreme Court reversed the Ninth Circuit's contrary holding.  Observing that "[t]he mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right," id. (quoting Rushen v. Spain, 104 S.Ct. 453, 459 (1983) (Stevens, J. concurring)), the Court explained that "a defendant has a due process right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge[, and that t]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'"  Id. (quoting Snyder v. Massachusetts, 54 S.Ct. 330, 332 and 333 (1934)).  The Court also cautioned that "the exclusion of a defendant from a trial proceeding should be considered in light of the whole record."  Id. (citing Snyder, 54 S.Ct. at 335).

Olis argues that

> unlike in *Gagnon* — where there was never any real suggestion of bias and the record firmly established that the juror was not biased — *Virgil*, *Hughes*, and *Nell* establish beyond cavil that a juror's direct expression of bias raises a presumption that the juror is, in fact, biased. And since a defendant has a constitutional right to be tried by an impartial jury, see U.S. Const. amend. VI, *Virgil*, 446 F.3d at 605, a conference to explore an overt expression of bias relates directly to the question whether the defendant may be constitutionally tried by the jury as presently empaneled. Thus, a conference with a juror who has overtly expressed bias bears a substantial relation to a defendant's opportunity to defend against the charge. . . Olis had a right to be present, and to have his counsel present, at the Court's conference with the biased juror.

-63-

Counsel's failure to vindicate these rights constituted
ineffective assistance of counsel.[121]

The Due Process Clause only guarantees a defendant the right
to be present at a given stage of his trial to the extent that a
fair and just hearing would be thwarted by his absence.  See Snyder
54 S.Ct. at 332-33.  As the Supreme Court observed in Gagnon, the
encounter between the court and the juror in this case was "a short
interlude in a complex trial; the conference was not the sort of
event which every defendant had a right personally to attend under
the Fifth Amendment."  105 S.Ct. at 1484.  Had Olis and counsel for
both sides been present, they could not have assisted.  Indeed, for
the reasons explained by the court on the record,[122] their presence
may have prevented the juror from speaking openly.  Olis' absence
from the court's sidebar conferences with counsel, at which the
court conferred with counsel about how best to proceed in light of
the juror's comments, similarly had no adverse effect on Olis or
the fairness of the trial.  These sidebar conferences were more
akin to hearings on an issue of law to which a defendant has little
to contribute, than to stages of trial at which a defendant has a
due process or statutory right to be present.  In sum, the court's
ex parte communications with a juror, followed by sidebar
conferences with counsel for both sides effected neither a

---

[121]Id. at 42.

[122]T.Tr. Day 2, Docket Entry No. 97, 123:1-16.

violation of Olis' rights to due process nor a violation of rights protected by Federal Rule of Criminal Procedure 43.   Accordingly, neither the failure of Olis' trial counsel to object to the court's ex parte communications with the juror nor the failure of Olis' appellate counsel to raise this error on direct appeal reflect attorney performance that fell below an objective standard of reasonableness, or prejudiced Olis by depriving him of a fair trial with a reliable result.

(c)   Erroneous Jury Instructions

Olis argues that his trial and appellate counsels' representation was constitutionally ineffective because they failed either to object to or to appeal from the court's erroneous instruction to the jury concerning the mail and wire fraud counts. With regard to the wire fraud counts Olis argues that the court incorrectly instructed the jury that the government did not need to prove that the material transmitted by wire was itself false or fraudulent,[123] and with regard to the mail and wire fraud counts Olis argues that the court incorrectly defined "scheme to defraud" as "any scheme to deprive another of money or property."[124]   Olis argues that

> [t]hese failures prejudiced Olis because the government's course of proof was not sufficient to demonstrate guilt under the proper legal standards.   Moreover, the legal

---

[123]Olis' Points and Authorities, Docket Entry No. 315, pp. 96-98.

[124]Id. at 98 (citing T.Tr. Day 8, Docket Entry No. 105, pp. 30:7-9 and 32:8-10).

infirmities in the mail and wire fraud convictions
infects the other counts as well, and reversal is
required on all counts.[125]

### (1)   Falsity of Material Transmitted by Wire

Relying on <u>Parr v. United States</u>, 80 S.Ct. 1171 (1960), and
<u>United States v. Curry</u>, 681 F.2d 406 (5th Cir. 1982), Olis contends
that his convictions on the three wire fraud counts (Counts Four
through Six) must be set aside because his trial counsel rendered
constitutionally inadequate assistance by failing to object when
the court erroneously instructed the jury "[i]t is not necessary
that the government prove . . . that the material transmitted by
wire was itself false or fraudulent."[126]  Olis argues that the court
gave this instruction in error because the wire fraud counts in
this case are based on the filing of two Form 10-Qs and one Form
10-K, documents which Hecker testified Dynegy was required by law
to file electronically with the Securities and Exchange Commission
(SEC).  Acknowledging that the government is not "[g]enerally . . .
required to prove that the mailed or wired material was itself
false or fraudulent,"[127] Olis argues

> that general principle is subject to an important caveat.
> The "*Parr* exception" holds that when a statement is
> required by law to be mailed or wired, then that
> statement cannot form the basis of a fraud conviction

---

[125]<u>Id.</u> at 96.

[126]<u>Id.</u> (citing T.Tr. Day 8, Docket Entry No. 105, p. 32:21-24).

[127]Olis' Response, Docket Entry No. 349, p. 44.

unless it is actually false or fraudulent. *United States v. Curry*, 681 F.2d 406, 412 (5th Cir. 1982) ("mailings of documents which are required by law to be mailed, and which are not themselves false and fraudulent, cannot be regarded as mailed for the purpose of executing a fraudulent scheme")(citing *Parr v. United States*, 363 U.S. 370, 390-91, 80 S.Ct. 1171, 1183-84 (1960)).[128]

In Parr the Supreme Court held that members of a school board could not be held liable for mail fraud based on mailings that were required under state law unless the mailings were false or fraudulent. 80 S.Ct. at 1171. In Curry the Fifth Circuit relied on Parr to hold that the defendant could not be convicted of mail fraud based on affidavits that he mailed pursuant to Louisiana's statute governing campaign-finance disclosure unless the government proved that the affidavits were false and that the defendant either intended to defraud the state agency to which they were mailed or mailed them "in a deliberate attempt to prevent discovery of his scheme to defraud." 681 F.2d at 412. See also United States v. Krenning, 93 F.3d 1257, 1263 (5th Cir. 1996) (recognizing that the Parr exception "applies only where the mailings are both not themselves false or fraudulent, and their mailing is required by law"). In United States v. Bright, 588 F.2d 504, 509 (5th Cir.), cert. denied, 99 S.Ct. 1537 (1979), the Fifth Circuit held that the "innocent mailings" exception established by Parr does not apply where the legal requirement to make the mailings is triggered by the fraudulent scheme. Id. at 509-10 ("If [the defendants] had not

---

[128]Id. at 44-45.

decided to defraud the estate of their late cousin, they would not have had to comply with the state law requiring them to file the creditors' notice."). See also Schmuck v. United States, 109 S.Ct. 1443, 1449 n.7 (1989) (distinguishing Parr by noting that the mailing of the tax documents "would have been made regardless of the defendants' fraudulent scheme," whereas the mailings at issue were "derivative" of Schmuck's fraudulent scheme and "would not have occurred but for that scheme").

Since it is undisputed that Dynegy was required by law to file with the SEC the 10Q and 10K forms on which the wire fraud charges are based regardless of the defendant's scheme to defraud, the court erroneously instructed the jury that "[i]t is not necessary for the government to prove . . . that the material transmitted by wire was itself false or fraudulent."  Under the specific facts of this case, the government was required to show that the 10Q and 10K forms that Dynegy submitted electronically to the SEC were false or fraudulent.  However, assuming without deciding that Olis' trial and appellate counsel unreasonably failed either to object to this erroneous instruction at trial or to raise it on direct appeal, Olis is not entitled to relief because he has failed to show either that the 10Q and 10K forms at issue were not false or fraudulent or that he was prejudiced.

In this case the government alleged that Olis and his co-conspirators devised and executed a scheme to defraud based on the characterization of proceeds from Project Alpha in Dynegy's

financial statements as proceeds from operations, i.e., risk-management activities, instead of proceeds from financing activities.   The government also alleged that Olis and his co-conspirators knew and intended

> that Dynegy would and did falsely report to the SEC, Rating Agencies, lenders, market and securities analysts, and the investing public, by means of electronic filing of Quarterly Reports ("Forms 10-Q") and an Annual Report ("Form 10-K"), that approximately $300,000,000 of "cash flows from financing activities" were "cash flows from operating activities," or more specifically, "cash flows from Risk-management activities," throughout the last 9 months of the year 2001.[129]

Although Olis has argued that the accounting treatment accorded to Project Alpha in Dynegy's financial statements was not false and fraudulent because it did not violate GAAP, the government's contention that the financial statements were false and fraudulent was not based on GAAP violations but, instead, on the co-conspirators' concealment of the outside hedges and tear-up agreements.  Evidence that Dynegy's financial statements were false and fraudulent due to the co-conspirators' failure to fully disclose Project Alpha was overwhelming.[130]  Moreover, as explained in the jury instructions, Olis' defense to the charges alleged in the indictment was not that the proceeds from Project Alpha were truthfully and accurately reported in Dynegy's financial statements but, instead, that

---

[129]Indictment, Docket Entry No. 1, p. 11 ¶ 21.

[130]This evidence includes but is not limited to incriminating e-mail messages circulated among the co-conspirators.  See p. 2 n.1, above.

> he did not intentionally and knowingly employ a deceptive
> device or contrivance or engage in a conspiracy to
> defraud Dynegy's auditor, Arthur Andersen, L.L.P., or any
> other person or entity as alleged in the indictment
> because . . . he followed the advice of Arthur Andersen,
> L.L.P., which had knowledge and permitted the use of the
> hedges to protect the 3% equity in each of the Special
> Purpose Entities; and that he followed the advice of
> Vinson & Elkins in including the tear-up language in
> amendments.[131]

See Olis, 429 F.3d at 542 (describing Olis' defense at trial as

being that "everyone working on Project Alpha, including Arthur

Andersen accountants, knew that the bank owners . . . were fully

hedged against the risk of loss from variable gas prices").

Accordingly, the court concludes that Olis suffered no prejudice

from the failure of his counsel either to object to the court's

erroneous instruction at trial or to raise this issue on appeal.

### (2)   Definition of "Scheme to Defraud"

Olis argues that the court's instructions for the mail and

wire fraud counts (Counts Three through Six) incorrectly defined

"scheme to defraud" as "any scheme to deprive another of money or

property."[132]   Olis argues that this instruction was incorrect and

highly prejudicial because "no evidence was presented at trial that

Olis or his alleged co-conspirators intended to obtain money or

property.   Rather, the government attempted simply to show that

investors were harmed when they purchased Dynegy stock."[133]   Citing

---

[131]Jury Instructions, Docket Entry No. 90, p. 13.

[132]Olis' Points and Authorities, Docket Entry No. 315, p. 98.

[133]Id. at 98.

<u>Cleveland v. United States</u>, 121 S.Ct. 365, 374 (2000), and <u>McNally</u> <u>v. United States</u>, 107 S.Ct. 3875, 3881 (1987), Olis argues that the jury instructions improperly deleted the "obtaining" element and permitted the jury to convict by finding a scheme simply to deprive another of property, but that "deprivation is a necessary, but not a sufficient, condition of mail and/or wire fraud because "only a scheme to obtain money or other property from the victim of fraud violates the [mail and wire fraud] statutes."[134]

The court is not persuaded that Olis' trial and/or appellate counsel rendered constitutionally ineffective assistance by failing to object to the definition of "scheme to defraud" about which Olis complains.   Olis does not argue that the court incorrectly instructed the jury on the elements of either the offense of mail fraud or wire fraud but only that its explanatory statement that "[a] 'scheme to defraud' <u>includes</u> any scheme to deprive another of money or property by means of a false or fraudulent pretense, representation, or promise" erroneously failed to advise the jury that the alleged "scheme to defraud" had to be a scheme to <u>obtain</u> money or property.

When the court instructed the jury on the charge of conspiracy to commit securities fraud, mail fraud, or wire fraud, the court explained that the indictment alleged the defendant and at least

---

[134]Olis' Response, Docket Entry No. 349, p. 48 (quoting <u>United States v. Walters</u>, 997 F.2d 1219, 1227 (7th Cir. 1993)).

one other person made an agreement to commit the crime of
securities fraud, mail fraud, or wire fraud as charged in the
indictment, and that the indictment alleged the following objects
or purposes of the agreement:

    (A)  To knowingly devise and intend to devise a scheme
         and artifice to defraud, and <u>for obtaining money</u> by
         means of false and fraudulent pretenses,
         representations, and promises, and to knowingly use
         and cause to be used the United States mails . . .
         in violation of Title 18, United States Code,
         Section 1341; AND

    (B)  to knowingly devise and intend to devise a scheme
         and artifice to defraud, and <u>for obtaining money</u> by
         means of false and fraudulent pretenses,
         representations, and promises, and to knowingly
         transmit and cause to be transmitted by means of
         wire . . . for the purpose of executing such scheme
         or artifice, in violation of Title 18,
         United States Code, Section 1343.[135]

Thus, the court correctly described the offenses of mail fraud and
wire fraud alleged in the indictment as schemes for obtaining money
by false and fraudulent pretenses.  The explanatory language about
which Olis complains comes straight out of the Fifth Circuit
Pattern Jury Instructions, <u>see</u> 2001 Fifth Circuit Criminal Jury
Instructions § 259 (mail fraud) and § 2.60 (wire fraud), and Olis
has not cited any authority holding that it misstates the law.[136]

---

[135]Jury Instructions, Docket Entry No. 90, pp. 11-12 (emphasis
added).  See also T.Tr. Day 8, Docket Entry No. 105, p. 22:19-23:8.

[136]Olis cites <u>United States v. Svete</u>, 521 F.3d 1302, 1310 (11th
Cir. 2008), for its holding that the Eleventh Circuit pattern jury
instructions concerning the "scheme to defraud" element of mail
                                                         (continued...)

See United States v. Klein, 543 F.3d 206, (5th Cir. 2008) (court did not err by giving definition of "scheme to defraud" that was substantially similar to one in the Fifth Circuit pattern jury instruction, which did not mislead jury or impair the defendant's ability to present a particular defense).

Olis argues that his counsels' failure to object to the inclusion of this language in the jury instructions prejudiced him because it relieved the government from having to "prove that Olis intended to obtain any money or property."[137]   This argument is merely an attempt to reassert the sufficiency of the evidence argument that was raised and rejected on direct appeal.   See Davis v. United States, 94 S.Ct. 2298, 2304-05 (1974) (a § 2255 motion may not be used to relitigate an issue that was raised and considered on direct appeal without some highly extraordinary circumstances, such as an intervening change in the law); United States v. Webster, 392 F.3d 787, 791 (5th Cir. 2004) (issues that were raised and rejected on direct appeal are barred from consideration on collateral review).[138]   Olis does not argue or make

---

[136](...continued)
fraud was deficient and incorrect under established circuit precedent.   However, the Eleventh Circuit has since vacated that panel opinion and granted rehearing en banc.   See United States v. Svete, 532 F.3d 1133 (11th Cir. 2008).

[137]Olis' Response, Docket Entry No. 349, p. 49.

[138]The United States observes that evidence presented at trial showed that the scheme alleged in the indictment was a scheme for Dynegy, through Olis and his co-conspirators, to obtain money by avoiding an increase in its cost of borrowing in relation to its energy trading activities, and was also intended to deprive others of money by inflating the value of Dynegy's stock.   United States' Memorandum, Docket Entry No. 346, pp. 58, 76-79.

any showing that the instruction about which he complains impaired his ability to present a particular defense or to argue that the government had not established his intent to defraud beyond a reasonable doubt.  Indeed, during closing argument, Olis' counsel expressly argued, "You know, when you think of fraud, you think somebody is getting some money, you know.  And who got the money? Arthur Andersen.  I'll tell you, Arthur Andersen did their dirty tricks, not Jamie Olis."[139]

Because the court's instructions to the jury correctly described the crimes of mail and wire fraud alleged in this case as "a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations, and promises,"[140] because the explanatory statement about which Olis complains is a correct statement of the law that appears in the Fifth Circuit's Pattern Jury Instructions, and because Olis makes no showing that the explanatory statement about which he complains impaired his ability either to argue that the government had not proved each element of the mail and wire fraud offenses beyond a reasonable doubt or to present his defense, the court is not persuaded that the failure of his trial counsel to object to this explanatory statement or his appellate counsel to raise this issue

---

[139]T.Tr. Day 8, Docket Entry No. 105, p. 73:1-4.

[140]Jury Instructions, Docket Entry No. 90, pp. 11-12 (emphasis added).  See also T.Tr. Day 8, Docket Entry No. 105, pp. 22:19-23:8.

on direct appeal reflect attorney performance that fell below an objective standard of reasonableness or prejudiced him such that he was deprived of a fair trial with a reliable result.

(d)   Failure to Take Other Necessary Steps

Olis argues that his trial counsel's representation was constitutionally ineffective because he failed to take other steps necessary to mount an adequate defense, i.e., purchase a searchable database program to facilitate discovery review, hire a jury consultant, and retain expert witnesses to rebut Heil's testimony regarding losses caused by Project Alpha and to supply vital accounting expertise.

The record does not demonstrate that trial counsel's representation fell below the threshold of reasonableness. Olis' trial counsel pursued a three-pronged strategy aimed at countering the government's evidence of intent to defraud.   First, trial counsel urged the jury to find Olis not guilty because the government had not proved beyond a reasonable doubt that he possessed the intent to defraud anyone.   Second, trial counsel sought and received an advice-of-counsel jury instruction and urged the jury to find Olis not guilty because all of his acts had been undertaken in good faith reliance on the advice that he had received from accountants and attorneys.   Third, trial counsel worked to discredit the testimony of the government's star witnesses, Foster and Olis.   To discredit Foster, trial counsel

-75-

cross-examined him about discrepancies between the testimony he gave before the SEC and the testimony he gave in this trial, and the reasons for which he decided to plead guilty (i.e., pressures caused by his being the breadwinner for a family of seven children). To discredit Hecker, trial counsel cross-examined him about the fees that Arthur Andersen earned as a result of Project Alpha not just from representing Dynegy but as an equity partner of another entity involved in the transaction. A review of the record establishes that even if trial counsel had taken the steps that Olis now argues should have been taken, the result would have been the same.

As the Fifth Circuit Court of Appeals recognized in affirming Olis' conviction, "[a] reasonable jury, basing its conclusion on the testimony of Foster and Hecker, together with the incriminating emails among Olis and his co-indictees and a wealth of other evidence, could easily have found Olis guilty beyond a reasonable doubt of all the charged crimes." Olis, 429 F.3d at 543. Since Olis fails to demonstrate that taking the extra steps that he now argues his trial counsel should have taken would have allowed them to do a better job of refuting and/or discrediting the testimony of Foster and Hecker, or would have allowed them to refute any of the incriminating e-mails exchanged with his co-conspirators, some of which the government used to prove the element of intent, the court is not persuaded that Olis has shown either that his trial counsels' failure to take these extra steps fell below an objective

-76-

standard of reasonableness or prejudiced Olis such that he was deprived of a fair trial with a reliable result.

### 3.   Conclusions

For the reasons explained above, the court is not persuaded that Olis has established that the representation provided to him by either his trial or his appellate counsel fell below an objective standard of reasonableness or prejudiced Olis such that he was deprived of a fair trial with a reliable result.

## V.   Olis' Motion for Reconsideration

Asserting that "all of Olis' claims are meritorious, and in no instance do the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the [government] is entitled to judgment as a matter of law,"[141] and that he "is entitled to discovery to support his claims,"[142] Olis asks the court to "reconsider its denial of Olis' motion for discovery (Docket # 327)."[143]

"The standard for granting [a motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the

---

[141]Olis' Response, Docket Entry No. 349, pp. 53-54.

[142]Id.

[143]Id.

-77-

court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Schrader v. CSX Transportation, Inc., 70 F.3d 255, 257 (2d Cir. 1995). See also Eisemann v. Greene, 204 F.3d 393, 395 n.2 (2d Cir. 2000) (per curiam) (to be entitled to reconsideration a party "must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion"). The high burden imposed on parties seeking reconsideration has been established to discourage litigants from making repetitive arguments on issues that have already been considered by the court, to ensure finality, and to prevent the practice of a losing party examining a decision and then plugging the gaps of the lost motion with additional matters. Petitioner may neither repeat arguments already briefed, considered, and decided, nor advance new facts, issues, or arguments that could have been presented. See In re Application of the United States for An Order, 396 F.Supp.2d 294, 301 (E.D.N.Y. 2005).

The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with Olis' § 2255 motion. As indicated by the length of both this Memorandum Opinion and Order and the March 3, 2008, Memorandum Opinion and Order in which the court denied Olis' motion for discovery (Docket Entry No. 344), the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible

when addressing Olis' claims and the parties' arguments.  Yet, without disputing either the legal standard that the court applied in ruling on his motion for discovery or the reasons for which the court denied that motion, Olis ends his response in opposition to the government's motion for summary disposition of his § 2255 motion with a cursory, one-line request for reconsideration of the court's decision to deny his motion for discovery.  Since Olis has not argued that the court applied the wrong legal standard in ruling on his motion for discovery and has not made any showing from which the court could conclude that he needed discovery to respond to the government's motion for summary disposition of his § 2255 motion, Olis has not provided the court with any reason to reconsider its denial of his motion for discovery.  The court can only conclude that Olis' motion for reconsideration is based not on new facts or arguments but, instead, on the same facts and arguments previously raised and previously rejected by the court in the March 3, 2008, Memorandum Opinion and Order (Docket Entry No. 344).  Accordingly, Olis' motion for reconsideration will be denied.

## VI.  Certificate of Appealability

"An appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus."  28 U.S.C. § 2255(d).

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability" (COA).  28 U.S.C. § 2253(c)(1)(B).  Although Olis has not yet filed a notice of appeal, this court nonetheless addresses whether he would be entitled to a COA.  See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may sua sponte rule on a COA because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court.  Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A COA "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits."  Miller-El v. Cockrell, 123 S.Ct. 1029, 1039 (2003).  To warrant a grant of the COA as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 120 S.Ct. 1595, 1603-04 (2000).  This standard requires a § 2255 movant to demonstrate that reasonable jurists could debate whether the motion should have been resolved differently, or that

the issues presented deserved encouragement to proceed further. United States v. Jones, 287 F.3d 325, 329 (5th Cir.), cert. denied, 123 S.Ct. 1549 (2002) (relying upon Slack, 120 S.Ct. at 1603-04). The court concludes that reasonable jurists could not debate the denial of Olis' § 2255 motion on substantive grounds nor find that the issues presented are adequate to deserve encouragement to proceed.   Accordingly, Olis is not entitled to a COA as to his claims.

## VII.   Conclusions and Order of Dismissal

For the reasons explained above, the United States' Motion for Summary Denial of Jamie Olis' motion to vacate (Docket Entry No. 346) is **GRANTED**; Olis' Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Docket Entry No. 305) is **DENIED**; and Olis' Motion for Reconsideration of Olis' Motion for Discovery (Docket Entry No. 349) is **DENIED**.   The court also **DENIES** Olis a Certificate of Appealability.

**SIGNED** at Houston, Texas, on this 21st day of November, 2008.

SIM LAKE
UNITED STATES DISTRICT JUDGE